OPINION
{¶ 1} Charles Spurlock, Jr. (individually referred to as "Spurlock"), and Lisa Spurlock, plaintiffs-appellants (collectively referred to as "appellants"), appeal from a judgment of the Franklin County Court of Common Pleas, in which the court granted summary judgment to Buckeye Boxes, Inc. ("Buckeye"), defendant-appellee, and denied summary judgment to appellants.
 {¶ 2} Spurlock was employed by Buckeye, working mostly on an "EMBA" machine. On September 13, 2001, Spurlock and another employee, Lannis Gilbert, had completed a production run on a coater machine ("coater") manufactured by Black Brothers, Company ("Black Brothers"). A supervisor at Buckeye directed Gilbert and Spurlock to clean the coater and the surrounding floor. The coater has rollers that create pinch points. Leaving the rollers turning, Gilbert hosed the coater from the out-turning side. Spurlock began sweeping the floor around the coater. He moved an unattached "feed table" from in front of the coater's in-turning rollers so he could sweep debris. Buckeye had removed an attached feed table from the coater sometime before this date and replaced it with the movable table. As he swept, Spurlock noticed a rag hanging from a drip tray, which was approximately one and one-half feet away from the pinch point on the in-turning rollers. Spurlock retrieved the rag with his hand, but the rag became caught in the rollers, pulling his hand and arm into the pinch point, thereby crushing his arm.
 {¶ 3} On April 8, 2003, Spurlock and Lisa Spurlock, his now ex-wife, filed an action against Buckeye, several John Does and John Roes, and Black Brothers, who was eventually dismissed without prejudice. As pertinent to Buckeye, appellants alleged employer intentional tort; willful, wanton, and reckless conduct; and loss of consortium. On April 14, 2005, Buckeye filed a motion for summary judgment. On May 13, 2005, appellants filed a motion for summary judgment. On February 23, 2006, the trial court granted Buckeye's motion for summary judgment and denied appellants' motion for summary judgment. The trial court filed a judgment on the matter on March 1, 2006. Appellants appeal the judgment of the trial court, asserting the following assignment of error: 
 1) THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT-APPELLEE BUCKEYE BOXES, INC. AND IN DENYING SUMMARY JUDGMENT ON LIABILITY TO PLAINTIFFS SPURLOCK.
 {¶ 4} In their sole assignment of error, appellants argue that the trial court erred in granting summary judgment to Buckeye and denying their motion for summary judgment. When reviewing a motion for summary judgment, courts must proceed cautiously and award summary judgment only when appropriate. Franks v. The Lima News (1996), 109 Ohio App.3d 408. Civ. R. 56(C) provides that, before summary judgment may be granted, it must be determined that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the non-moving party, that conclusion is adverse to the non-moving party. State ex rel. Howard v. Ferreri (1994),70 Ohio St.3d 587, 589. When reviewing the judgment of the trial court, an appellate court reviews the case de novo. Franks, supra.
 {¶ 5} In the present case, the trial court found that appellants had failed to establish the necessary elements of an employer intentional tort. To establish an employer intentional tort, an employee must demonstrate the following: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that, if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. Fyffe v. Jeno's,Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus.Fyffe further states that:
 * * * [P]roof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent.
Fyffe, supra, at paragraph two of the syllabus.
 {¶ 6} The burden is upon the plaintiff to establish proof of the intentional tort beyond that required to prove negligence or recklessness. Id., at paragraph two of the syllabus. An employer is treated as if he had intended to cause injury to the employee "only when a reasonable person could infer from the surrounding circumstances that the employer, with knowledge of a risk of certain injury from adangerous condition, still requires an employee to perform the dangerousprocedure." (Emphasis sic.) Youngbird v. Whirlpool Corp. (1994),99 Ohio App.3d 740, 747, citing Fyffe, supra, at paragraph two of the syllabus. Evidence that an employer implicitly required an employee to engage in a dangerous task may satisfy the third prong of Fyffe. Hannah v. DaytonPower Light Co. (1998), 82 Ohio St.3d 482, 487. Nevertheless, an employer cannot be expected to anticipate an employee's actions that lead to an injury where that employee has alternative means of proceeding available to him. Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, 118.
 {¶ 7} Appellants argue that the evidence demonstrates Buckeye knew of the dangerous process/condition in its workplace and knew it was substantially certain that Spurlock would be injured while using the unguarded coater without proper training but required him to proceed to encounter the danger. We disagree. Appellants' assertion is that having a removable table at the pinch point of the coater without adequate training was a dangerous condition. However, even if we were to assume that the first element of an employer intentional tort fromFyffe was satisfied because Buckeye knew that the coater was dangerous since it had removed the affixed table and had replaced it with a removable one, we cannot find that the second element was satisfied because Buckeye did not have knowledge that, if Spurlock was subjected to cleaning the floor around the coater, harm to Spurlock would be a substantial certainty.
 {¶ 8} We begin our analysis by first highlighting that the deposition testimony established that no other employee had been injured on the coater in the approximately 15 years it had been owned by Buckeye, including the period prior to the injury in question during which the coater's feed table had been changed from the attached table to the removable table. Tom Leatherman, Buckeye's manufacturing asset manager, stated that no other employee at Buckeye had ever been injured on the coater and, in fact, since he began working at Buckeye in 1972, he remembered no other employee suffering a pinch or crush injury to the fingers on any machine. The evidence suggests that this machine was one that was in regular use at Buckeye and, presumably, clean ups and sweepings around the coater occurred on a frequent basis. John Howe, the vice president of Buckeye, testified that Spurlock had worked on the coater and cleaned the coater without incident prior to this accident. Jim Mullins, Spurlock's supervisor at Buckeye, testified that he had seen Spurlock cleaning the machine at least twice before with no problems. The lack of any prior injuries tends to demonstrate that Buckeye did not know that the coater, or using a movable feed table with the coater, was substantially certain to cause an injury. In considering the substantial certainty analysis, the absence of prior similar accidents strongly suggests that injury from a procedure was not substantially certain to occur. Harris v. Bekaert Corp., Wayne App. No. 05CA0056, 2006-Ohio-1487, at ¶ 21, citing Thomas v. Barberton Steel Iron, Inc. (Apr. 1, 1998), Summit App. No. 18546. See, also, Zink v.Owens-Corning Fiberglas Corp. (1989), 65 Ohio App.3d 637, 643-644
(evidence showing lack of prior accidents negates daunting standard of substantial certainty and intentional tort). Consistent with this well-established tenet, appellants' own expert, James Vaughan, agreed that Buckeye did not appear to have any notice that an injury of the kind in question would occur because there had been no incidents involving the coater in the past 15 years. Therefore, that there had been no prior injuries on the coater, even after the movable table was in use, strongly suggests that Buckeye did not possess the requisite knowledge arising to the level of "substantial certainty."
 {¶ 9} Appellants' first contention is that Buckeye knew that injury was substantially certain to occur because Buckeye had failed to train Spurlock on how to clean the coater and explain the safety issues involving this coater. First we note, as did the trial court and Spurlock's expert, Vaughan, Spurlock was not personally cleaning the coater at the time of his injury. Gilbert was cleaning the actual coater and its rollers by spraying the rollers from the rear of the machine, where the rollers were out-turning. Spurlock's job was to sweep around the coater and pick up the scraps from the prior job on the machine, and Spurlock stated he had no intention to clean the coater. There was no evidence that Spurlock was directed to clean any part of the coater. Particularly, no representative of Buckeye ever directed Spurlock to reach his hands near the moving rollers in order to pick out a rag, and such act was not a required part of his job assignment. See, e.g.,Youngbird, supra, at 747-748 (no intentional tort when worker was never actually required by any supervisory personnel to reach into shearing machine rollers while they were moving); Tipton v. Bernie's ElectricSales Serv., Williams App. No. WM-02-009, 2003-Ohio-1629, at ¶ 32 (the fact that employer never required injured employee to leave the power on when working around the electrical lines supported finding that there was no employer intentional tort); King v. Hancock Mfg. Co., Inc. (Dec. 14, 1999), Jefferson App. No. 97 JE 72 (no intentional tort where employer never instructed its employees to use their hands and never told them to leave the machines running when they removed scrap metal that got caught in a chute).
 {¶ 10} Notwithstanding, an employer cannot be held to know that harm is substantially certain to occur when it has taken measures that would have prevented the injury altogether had they been followed. SeeRobinson v. Icarus Indus. Constructing Painting Co. (2001),145 Ohio App.3d 256, 262. When safety devices or rules are available but are ignored by employees, the requisite knowledge of the employer is not established. Id. Here, the record before the trial court was replete with evidence that Buckeye had in place policies and warnings that were ignored by Spurlock. Howe and Leatherman testified that the coater had on the side of it the manufacturer's cautionary labels, steel plates, and printed sheets, which warned about pinch points and reminded operators to keep their hands away from the revolving rollers and keep one hand on the safety control bar while cleaning. Gerald Rennell, appellants' expert, also testified that the coater had various warnings on labels and plaques, including a red one that addressed the cleaning process. Thus, it was clear that Buckeye properly maintained the requisite warnings on the coater. See, e.g., Reising v. BroshcoFabricated Prods., Richland App. No. 2005CA0132, 2006-Ohio-4449, at ¶ 45 (no intentional tort when the press itself had a warning posted on it that warned operators to keep their hands out of the machine die area); King, supra (the machine on which worker was injured had warning decal indicating, among other things, that the operator should not place hands or any part of the body in the machine while in operation; should shut off power before beginning repair, cleaning or service work; and be sure all safety devices are in place). Several Buckeye supervisors also stated it was a policy and the "culture" at Buckeye not to place hands near moving rollers, and Spurlock acknowledged that he was aware that Buckeye did not like workers to clean when the rollers were running on machines. Thus, these clear safety and procedural rules were intended by Buckeye to be followed by employees, and it could have reasonably expected that Spurlock would follow them. See id., at ¶ 45, citingSanek v. Duracote Corp. (1989), 43 Ohio St.3d 169, 172 (employer did not know that the worker would decide on his own to fail to follow company procedures); Tipton, supra, at ¶ 33 (no employer intentional tort when injured worker disregarded an existing policy and procedure guarding against an obvious and known risk); see, also, Davis v. AK Steel, Butler App. No. CA2005-07-183, 2006-Ohio-596, at ¶ 11 (no employer intentional tort when employer had adopted corporate safety regulations about the danger posed by a pinch point between moving rolls).
 {¶ 11} Importantly, Spurlock's own testimony demonstrated he was fully aware of both the warnings and the safety devices on the machine and understood them, but he still proceeded to take the actions that led to his injury. Spurlock testified he knew that, on the front of the coater, there was a red box that had one red shut off button and one green button on it with a gray master switch above them. He also knew, at the time of the accident, there was one jog bar across the front of the machine and one across the back that had a forward, neutral, and reverse capability to control the direction of the rollers. He was also aware that the machine had a yellow wheel on it that separated the main rollers and eliminated the possibility of a pinch-point injury. He also admitted he had known that, in order to have retrieved the rag safely, he could have pushed the stop button or used the jog bar. When safety devices are available, but are ignored by employees, the requisite knowledge of the employer is not established. See Robinson, supra, at 262 (worker did not fall to his death because there was a lack of safety equipment; instead, his death was the result of not utilizing the safety devices already in place, which he had consistently used in the past);Foust v. Magnum Restaurants, Inc. (1994), 97 Ohio App.3d 451, 456
(employer provided safety devices that the employee failed to use). Spurlock also testified that he knew there were plates and stickers attached to the coater that warned against the putting of hands near moving parts, he understood the message that the warnings were trying to convey, and he knew the moving parts were places to avoid. Spurlock also stated that the cautionary plates and stickers on the machine were not warning him against anything he already did not know, and he admitted that no additional stickers were going to make him any more aware of the pinch points than he already was at the time of the incident. Spurlock further conceded that he did not believe Buckeye knew that he might put his hand near the drip tray to take a rag out of it. Thus, the evidence was not contradicted that Spurlock appreciated the warnings and was aware of the safety devices on the machine, but chose to ignore them.
 {¶ 12} Relatedly, not only was Spurlock aware of the warnings placed on the machine, he also knew, based upon his experience and skills, the precise reason that these warnings had been placed on the machine was to protect workers from the dangers of crush injuries posed by the rollers. "Any analysis of the employer's intent must turn not only on the hazards of the machine but also the skills of the employee." Whisler v. Merrico,Inc., Richland App. No. 2004CA70, 2005-Ohio-3680, at ¶ 13 (no employer intentional tort when injured worker was not a novice, had been trained, knew the basic safety procedures, and knew a person should not put a hand into a press if it was turned on); King, supra (no intentional tort where injured worker was a "fairly experienced" operator who worked on a machine that contained a warning about cleaning the machine while it was running). Spurlock, who had just completed a two-hour job on the particular coater in question prior to his injury, testified that most of the machines he operated at Buckeye had pinch points, that he recognized the dangerous areas on the machines by watching them operate, and the danger points are not hidden. He stated it was "common sense" to keep fingers on the intake side of the machine away from the rollers because they could get sucked into the rollers. Thus, the evidence also established that Spurlock was aware of the dangers posed by roller-type machines based upon his prior experience and could relate the warnings on the coater to those known dangers.
 {¶ 13} There was also specific evidence that Buckeye had warned Spurlock verbally that pinch points were dangerous and could lead to injury. Specific to the coater in question, Mullins stated that he trained Spurlock and told him to keep his fingers away from the pinch points on the coater. In addition, the evidence demonstrated that Buckeye told Spurlock, in certain terms, that the pinch points on all machines with rollers were dangerous and he should not touch them. Howe testified that Spurlock was trained on how to clean roller-type machines. Leatherman stated that, as far as learning about pinch points, Spurlock was trained on the EMBA machine. Mullins indicated that, on Spurlock's first day of work, he showed Spurlock a machine and told Spurlock never to put his hands near the feed rolls while they were in operation. Mullins further testified that, when Spurlock went through the training for the EMBA machine, he was provided a paper that told him never to put any part of his body or any type of tool near any moving parts, and he personally told Spurlock to stop roller-type machines and separate the rollers if he ever had to go near them. Ed Wells, Buckeye's production manager, testified that Spurlock was trained to run 12 machines, all of which had rollers with dangerous pinch points.
 {¶ 14} We do not find significant the fact that most of the verbal warnings and training given to Spurlock by Buckeye were not specific to the coater in question but were general admonitions for all roller-type machines. Such does not diminish their value or significance with regard to Spurlock's duty to follow them and apply them to all roller-type machines. Spurlock's injury was not caused by a unique danger posed by this specific coater but by the identical general danger posed by all roller-type machines, which Spurlock had been trained to recognize and avoid. Buckeye was reasonably justified to believe that Spurlock would follow their training and apply his knowledge of basic safety rules to all roller-type machines. See Reising, supra, at ¶ 45, citingSanek, at 172 (employer need not anticipate that a worker will decide on his own to fail to follow instructions); Whisler, supra, at ¶ 16 (no intentional tort when the employer could not have known that the worker would neglect basic safety rules). Had Spurlock not ignored these rules and admonishments set forth by Buckeye, the injury in question would not have occurred.
 {¶ 15} Appellants' argument seeks to prove that it was Buckeye's removal of the original attached feed table that made Spurlock's injury substantially certain to occur. We disagree. First, the testimony of Spurlock himself makes clear that he would have still executed the same act had the original feed table been attached. Spurlock testified that whether or not the table had been physically attached, he would have crawled under the table to retrieve the rag. In addition, there was substantial testimony that the attached feed table would not have prevented all injures had it been in place. Mullins, Wells, Gilbert, and Leatherman all testified that, even if the original attached table would have been bolted in place, Spurlock could have still crawled under the machine to gain access to the tray and the same pinch point that caused his injury. Although Robert Stachlewitz, a representative from the coater's manufacturer, stated the severity of the pinch-point injury may have been lessened had the original feed table been in place, he indicated that, regardless of the absence of the original feed table, there was still an opportunity for a hand to come into contact with a turning roller from underneath the feed area. Appellants' expert, Rennell, agreed, testifying that the affixed table guard provided with the machine still would not have prevented a hand from reaching into the drip tray and contacting the pinch point. Spurlock likewise concurred that the permanent feed table did not prevent someone from putting a hand into the drip tray if that was what the person desired to do.
 {¶ 16} We also note that Stachlewitz, Spurlock, and Leatherman all testified that the purpose of the attached feed table, insofar as "guarding" was concerned, was to prevent the worker from being able to reach the pinch point from across the table while feeding stock into the rollers. Stachlewitz indicated that the table was not meant to prevent a worker from reaching under the table, and, in fact, the manufacturer made no guards to prevent such an act. Thus, the danger sought to be prevented by the attached feed table was not the danger that caused Spurlock's injury. While an employee need not show that his employer had knowledge of the specific harm that would befall him as a result of his exposure to the dangerous condition, the employee must show that his employer had actual knowledge of the "exact danger" that resulted in his injury. Burns v. Presrite Corp. (1994), 97 Ohio App.3d 377, 384. Here, the "exact danger" posed by the removal of the affixed feed table would have been a pinch-point injury while feeding stock, not the danger of contacting the pinch point from the area of the drip tray while retrieving a rag. Further, Stachlewitz's testimony that the manufacturer made no guards to prevent such an act militates against Buckeye's foreseeability of this danger. Therefore, because a pinch-point injury would not have necessarily been prevented had the original feed table still been in place, Buckeye could not have known that an injury was any more certain to occur if it were removed.
 {¶ 17} Also, while we agree that the original attached feed table limited the mode and direction of access to the drip tray, and its removal may have even increased the likelihood that a worker would move the unattached table and reach into the pinch-point area, the record does not establish that the removal of the original table itself made the injury substantially certain to occur. There are many activities within the business or manufacturing process which involve the existence of dangers against which management fails to guard. The failure to provide available safety devices may constitute negligence, but does not necessarily constitute substantial certainty. Liechty v. Yoder Mfg.,Inc. (2000), 141 Ohio App.3d 360, 364. Buckeye's failure to reinstall the attached table, even if it could be said to have created some risk of injury, failed to demonstrate that the risk increased to such a degree that it became a substantial certainty that Spurlock would be injured while sweeping around the coater. Knowledge of some risk falls far short of knowledge to a substantial certainty. See Goodin v.Columbia Gas of Ohio, Inc. (2000), 141 Ohio App.3d 207, 224. Therefore, we find Buckeye's removal of the attached feed table and/or failure to reattach it to the coater did not render injury to a worker sweeping around the coater a substantial certainty.
 {¶ 18} It must also not be overlooked that, while there may have been other devices that might have provided a higher degree of safety, including the original attached table, it is clear that, had Spurlock used the available safety devices, such as the jog bar or power switch, the injury would not have occurred. See Foust, supra, at 456 (although the employer could have implemented a safer system, the safety equipment provided, if used, would have been sufficient to prevent the employee's injuries). Leatherman stated that the removable feed table was also a safety device used to "guard by location," which means to physically separate the operator from a danger point. Leatherman stated it was understood that it was always to remain in place during operation and cleaning. Not only does Spurlock's removal of the unattached feed table show his circumvention of an available safety device, it demonstrates Buckeye's appreciation of a dangerous condition, and an attempt to guard against it. Whether this guard was adequate is a question of negligence, but does not rise to the level of an intentional tort. See Estep v.Rieter Automotive N. Am., Inc., 148 Ohio App.3d 546, 2002-Ohio-3411, at ¶ 33 (employer's installation of guards indicated an appreciation of a dangerous condition and an attempt to prevent injuries from such condition, and the adequacy of the additional guards was a question of negligence).
 {¶ 19} For these reasons, we find that, viewing the evidence most strongly in favor of appellants, reasonable minds could only conclude that appellants cannot demonstrate that Buckeye had knowledge that, if Spurlock was subjected to the coater, then harm to him was a substantial certainty. Appellants have failed to meet the requirements of the second prong of Fyffe; thus, their claim fails as a matter of law, and we need not consider the evidence related to the remaining prongs of theFyffe test. Therefore, the trial court did not err when it granted summary judgment to Buckeye and denied appellants' motion for summary judgment.
 {¶ 20} Accordingly, appellants' assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 FRENCH and McCORMAC, JJ., concur. McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.