DECISION AND JOURNAL ENTRY
{¶ 1} Appellants, Timothy and Virginia Rallya, appeal the judgment of the Lorain County Court of Common Pleas, which granted summary judgment in favor of Appellee, A.J. Rose Manufacturing Co. ("A.J. Rose"). This Court reverses.
 I. {¶ 2} On February 10, 2003, Timothy Rallya ("Rallya") was working for A.J. Rose as a tool and die maker, "flipping" a die to access the internal tooling, when the 4,760-pound die fell on his feet, severely injuring him. On February 6, 2007, Rallya refiled a complaint sounding in employer intentional tort. His wife Virginia alleged a claim for loss of consortium. On April 9, 2007, A.J. Rose filed both an answer and a motion for summary judgment. Rallya filed a brief in opposition, appending, among other documents, an affidavit of a purported expert, Richard Harkness. A.J. Rose moved to strike Harkness' affidavit. The company further filed its reply brief in support of its motion for summary judgment. On January 4, 2008, the trial court granted *Page 2 
the motion for summary judgment in favor of A.J. Rose and against Rallya. Rallya timely appeals, raising one assignment of error for review.
 II. ASSIGNMENT OF ERROR
"THE TRIAL COURT ERRED BY ENTERING [SUMMARY] JUDGMENT IN FAVOR OF A.J. ROSE."
 {¶ 3} Rallya argues that the trial court erred by granting A.J. Rose's motion for summary judgment because genuine issues of material fact exist with regard to all three elements of his employer intentional tort claim. This Court agrees.
 {¶ 4} This Court reviews an award of summary judgment de novo.[1]Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. This Court applies the same standard as the trial court, viewing the facts in the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-WoodwardCo. (1983), 13 Ohio App.3d 7, 12.
 {¶ 5} Pursuant to Civ. R. 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 6} To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue *Page 3 
as to any material fact, and that the moving party is entitled to judgment as a matter of law. Dresher v. Burt (1996), 75 Ohio St.3d 280,293. Once a moving party satisfies its burden of supporting its motion for summary judgment with sufficient and acceptable evidence pursuant to Civ. R. 56(C), Civ. R. 56(E) provides that the non-moving party may not rest upon the mere allegations or denials of the moving party's pleadings. Rather, the non-moving party has a reciprocal burden of responding by setting forth specific facts, demonstrating that a "genuine triable issue" exists to be litigated for trial. State ex rel.Zimmerman v. Tompkins (1996), 75 Ohio St.3d 447, 449.
 {¶ 7} The legislature modified R.C. 2745.01 addressing employer intentional tort liability on April 7, 2005. However, those provisions are inapplicable to this case because Rallya's accident occurred prior to the effective date of that statute.[2] Talik v. Fed. MarineTerminals, Inc., 117 Ohio St.3d 496, 2008-Ohio-937, at ¶ 17. Accordingly, the three-prong test set forth in Fyffe v. Jeno's,Inc. (1991), 59 Ohio St.3d 115, remains applicable to this Court's analysis. Talik at ¶ 17.
 {¶ 8} In Fyffe, the Ohio Supreme Court enunciated the legal standard by which courts must determine whether an employer has committed an intentional tort against an employee:
 "[I]n order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a *Page 4 
dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id. at paragraph one of the syllabus.
 {¶ 9} Rallya argues that genuine issues of material fact exist in regard to all three prongs of the Fyffe test. The Fyffe test is a conjunctive test, i.e., all three elements must be established in order to maintain a prima facie case of an intentional tort by an employer. It follows, therefore, that if there remains no genuine issue of material fact as to one of the elements, discussion of the other elements becomes moot. See Pintur v. Republic Technologies Internatl, LLC, 9th Dist. No. 05CA008656, 2005-Ohio-6220, at ¶ 11 (finding the issue of substantial certainty dispositive and not addressing the other Fyffe elements).
 {¶ 10} As a preliminary matter, this Court notes that A. J. Rose, as part of its "argument and law" asserts that the trial court should have stricken the affidavit of Rallya's expert. Although it never formally ruled on A.J. Rose's motion to strike the affidavit below, the trial court declined to consider the expert's assertions regarding what A.J. Rose "knew," stating that "Ohio law is clear that an expert may not opine as to an employer's state of mind." January 4, 2008 journal entry, citing Sanfrey v. USM Corp. (Dec. 17, 1990), 12th Dist. No. CA90-02-003, reversed on other grounds, (1991), 61 Ohio St.3d 718. The trial court, however, declined to strike the entire affidavit.
 {¶ 11} This Court has stated that "when a trial court fails to rule upon a [pretrial] motion, it will be presumed that it was overruled."Lorain v. Hodges, 9th Dist. No. 06CA008920, 2007-Ohio-456, at ¶ 11, quoting Franco v. Kemppel Homes, Inc., 9th Dist. No. 21769,2004-Ohio-2663, at FN4. A.J. Rose asserts its agreement with this proposition of law. It then argues in its *Page 5 
appellate brief that the trial court erred by failing to order the affidavit stricken from the record. A.J. Rose failed, however, to file a notice of cross appeal in this case.
 {¶ 12} App. R. 3(C)(1), regarding when a cross appeal is required, states:
 "A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order, shall file a notice of cross appeal within the time allowed by App. R. 4."
In this case, the trial court's implicit denial of A.J. Rose's motion to strike the expert's affidavit constitutes an interlocutory ruling merged into the final judgment on the motion for summary judgment. As A.J. Rose now seeks to challenge that ruling, it must have filed a cross appeal. As it failed to do so, this Court has no authority to consider A.J. Rose's challenge to the trial court's denial of its motion to strike.
 {¶ 13} In regard to substantive matters raised on appeal, Rallya argues that genuine issues of material fact exist in regard to all three prongs of the Fyffe test. The uncontested facts are as follows.
 {¶ 14} A.J. Rose manufactures automotive parts using dies which are designed and maintained at its two plants. This matter involves an incident at the Avon plant in which Rallya was injured when a 4,700-pound die fell and crushed his feet. Rallya had been working as a tool and die maker at A.J. Rose for 6 years at the time of the accident. Tool and die makers are responsible for repairing and maintaining the dies. In order to access the tooling for repair and maintenance, the tool and die maker must first open, then flip, the die. To open the die, he threads chains through four eye bolts on opposite sides of the top half of a die. Using a crane, he lifts the top half of the die and moves it over to rest on metal horses. At this point, the tooling is *Page 6 
facing downwards, so he must "flip" the die so the tooling is facing upwards and is therefore accessible for repair and maintenance.
 {¶ 15} Rallya was injured while flipping a medium-size transfer die. The die-flipping process at A.J. Rose for such dies was as follows. As the die rests tooling-side down on metal horses, the tool and die maker threads two chains through each of the two eye bolts on one side of the die. Using the control attached to a crane by a cord, the tool and die maker raises the die from a horizontal to a vertical position, at which point the die is completely suspended in the air. He then positions two metal horses onto which the die is lowered and tipped in the opposite direction from vertical to horizontal, exposing the tooling. Once the die approaches the horizontal position, another metal horse might be positioned underneath. After the repair and maintenance is performed, the tool and die maker flips the die, with tooling downward, in the same way; repositions the chains, two on opposite sides; lifts the die and moves it over on top of the bottom half; and lowers the top portion of the die onto the bottom to close the die.
 {¶ 16} Tool and die makers at A.J. Rose routinely use three horses while flipping transfer dies, although a fourth horse might sometimes be used if there is room for its placement without interfering with the tooling. The metal horses at A.J. Rose have wheels which are designed to retract under weight. When there is no weight on the horses, the wheels allow employees to easily move and position the horses.
 {¶ 17} Rallya first argues that the trial court erred by finding that no genuine issue of material fact exists in regard to the first prong of the Fyffe test regarding the employer's knowledge of a dangerous process, procedure, instrumentality or condition. To satisfy this first prong, "the plaintiff must show there was a dangerous process and the employer had actual knowledge of the consequences of the exact dangers which ultimately caused the injury." *Page 7 Tablack v. Bd. of Mahoning Cty. Commrs., 7th Dist. No. 07 MA 197,2008-Ohio-4804, at ¶ 19, citing Gibson v. Drainage Prods., Inc.,95 Ohio St.3d 171, 2002-Ohio-2008, at ¶ 28. It has often been said:
 "[D]angerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach." Boyd v. S.E. Johnson Co. (Sept. 10, 2001), 3d Dist. No. 11-01-01, quoting Naragon v. Dayton Power Light Co. (Mar. 30, 1998), 3d Dist. No. 17-97-21. See, also, Tablack at ¶ 19.
 {¶ 18} The Tablack court thoroughly enunciated further relevant considerations regarding the first prong as follows:
 "The mere fact that defendant's process involved the existence of dangers does not automatically classify defendant's acts or omissions as an intentional tort, even if management failed to take corrective actions or institute safety measures. Shelton v. U.S. Steel Corp. (S.D. Ohio, 1989), 710 F.Supp. 206, 210. Some dangers may `fairly be viewed as a fact of life of industrial employment' and an employer has not committed an intentional tort when an employee is injured by one of those dangers. Van Fossen v. Babcock Wilcox Co. (1989), 36 Ohio St.3d 100, 116. A dangerous condition exists when the danger `falls outside the "natural hazards of employment," which one assumes have been taken into consideration by employers when promulgating safety regulations and procedures.' Youngbird v. Whirlpool Corp. (1994), 99 Ohio App.3d 740, 747.
 "`[M]any employment situations involve obvious dangers incident to employment and that the purpose of the Workers' Compensation Act is to provide an employee with compensation for injury suffered by reason of a danger necessarily incident to his employment. An intentional tort action, conversely, allows an employee to recover for injuries suffered that are not caused by a danger necessarily incident to this employment. For example, operating dangerous machinery may be a necessary incident of an employment situation, but operating that dangerous machinery without proper safety mechanisms may not constitute a necessary incident of the employment. See Fyffe. In the former case, recovery likely could be had under the Workers' Compensation Act. In the latter case, recovery may be possible under the theory that the employer's conduct in failing to provide adequate safety mechanisms constituted an intentional tort.' Goodin v. Columbia Gas of Ohio, Inc. (2000), 141 Ohio App.3d 207, 216.
 "Moreover, `the `reasonable person' standard for determining negligence or recklessness is not used in this process. The fact that the employer might or should have known that if it required the employee to work under dangerous conditions the employee would certainly be injured is not enough to establish a case for intentional tort. Rather, the determination turns on whether the plaintiff *Page 8 
alleges facts showing the employer possessed actual or constructive knowledge of the dangerous situation.' Caldwell v. Petersburg Stone Co., 7th Dist. No. 02CA8, 2003-Ohio-3275, at ¶ 41.
 "Thus, the scope of this court's inquiry must focus on whether [the plaintiff] presented evidence which could prove that this was an injury associated with inherently dangerous work outside the scope of [his] employment and [the employer] knew of this danger. Dailey v. Eaton Corp. (2000),138 Ohio App.3d 575, 582; Moebius v. Gen. Motors Corp., 2d Dist. No. 19147, 2002-Ohio-3918, at ¶ 29; Long v. Internatl. Wire Group, Inc. (Aug. 22, 2000), 3d Dist. No. 3-2000-11." Tablack at ¶ 20-3.
 {¶ 19} In its motion for summary judgment, A.J. Rose argued that "flipping dies is a fact of industrial life at A.J. Rose[,]" and that Rallya testified during his deposition that it is a potentially dangerous situation whenever a die is suspended in the air and that "many things can go wrong[.]" The employer concluded that "there is no evidence that the dangers to which Rallya was exposed fell outside the range of risks inherent to this industry * * * [or] that Rallya's supervisors had actual knowledge of any `unreasonable danger.'"
 {¶ 20} Rallya argued in opposition that he was not injured merely because he was working with a very heavy die or because he was operating an overhead crane. Rather, Rallya argued that he was injured because A.J. Rose "employed an unreasonably dangerous process of die flipping that was not employed at other tool and die shops."
 {¶ 21} Rallya testified that he was injured when one of the two wheeled horses on which the die for tool number 4054 was resting started moving as he raised the die counterclockwise from the horizontal. He testified that the horse slipped out once the die reached the 2:00 position. As there was then nothing to support one side of the die, it fell and crushed his feet. Rallya testified that he tried to get out of the way but that there were wooden pallets with dies and die shoes behind him, blocking his retreat. He testified that he was standing to the left of the *Page 9 
front of the die and fairly close because he had to be prepared to reposition the horses once he started to lower the die.
 {¶ 22} Rallya testified that he started at A.J. Rose as a tool room apprentice. He testified that Ed Lege and Ed Kazol trained him to flip progressive dies, telling him to try to stay clear of the die as much as possible. Rallya testified that, because the crane control was attached to a cord, it was only possible to get about three feet away from the die during the flipping process. He testified that Stan Klick and Chad Barton showed him how to flip large transfer dies, but that there was no set method of flipping them. Rallya testified that he tried to flip those dies in the way in which he felt safest. He testified that he had only ever seen other employees start with two horses when flipping large transfer dies.
 {¶ 23} Rallya testified that he had never before experienced a horse rolling out from under a die, but he had heard of other incidents involving other employees in which dies were dropped to the floor. He also testified that other tool and die makers had discussed the die flipping procedure at A.J. Rose involving wheeled horses as being unsafe. He testified that the concern was that someone was going to get hurt, although he never discussed his own concerns with supervisors. He further testified that he never complained to union stewards about the die flipping procedure because he believed that other employees with more knowledge had already expressed those same concerns. Finally, Rallya testified that he had some limited experience flipping much smaller dies at another company but that he flipped those dies on long rails rather than mobile horses.
 {¶ 24} Ed Weltlich, a former tool and die maker at A.J. Rose, testified during his deposition that he had vast experience at various companies flipping dies. While he flipped dies on wheeled horses at one other company, he testified that, shortly after he began working at AJ. *Page 10 
Rose, he discussed bringing in blocks to use for flipping dies on the floor because he felt it was a safer method than using mobile horses. He testified that the supervisor vetoed the idea because resting the dies on the floor would put too much pressure on the die guide pins. He admitted during his deposition that he had had a mishap when both horses "kicked out" from under the die he was flipping, causing the die to swing and hit a skid of parts. He asserted that he had not properly positioned the die on the horse.
 {¶ 25} Robert Beck, a tool room manager at A.J. Rose, testified during his deposition that he held a die flipping training session after Rallya's accident at which a union employee demonstrated, pursuant to the company's new Die Flipping Safety Guidelines, the flipping of a progressive die, but not a larger transfer die. The guidelines require the use of six horses during the die flipping procedure and mandate that the employee stand at least six feet away from the die during the process. Mr. Beck testified that these written guidelines were no different than the informal guidelines in place at the time of Rallya's accident. After training on the new guidelines, most employees indicated in writing that they did not understand the written procedure.
 {¶ 26} Chad Barton, a tool and die maker at A.J. Rose, testified that no one went over the die flipping procedure specifically with him; rather, he received on the job training while working with other tool and die makers. He testified that he received no safety training regarding die flipping. Barton testified that he had two incidents in which a die fell to the floor during the flipping process when a wheeled horse "flew out." He testified that he completed incident reports and that a union steward, supervisor and the owner of the company were all aware of the incidents. *Page 11 
 {¶ 27} Thomas Conrad, a former A.J. Rose employee, testified during his deposition that on many occasions he brought it to everybody's attention that the die flipping procedure at A.J. Rose was unsafe because the wheels on the horses would pop up and "want[ed] to kick out." He further testified that he told others that sooner or later, someone was going to get hurt using the company's wheeled horse procedure. He testified that many years before Rallya's accident he asked that the company bring in wood on which employees could flip dies instead of using wheeled horses. Conrad testified that he saw a lot of "close calls," including damaged tooling, because dies would hit the horses, swing, and smash the tooling. He testified that he heard about an incident involving Ed Kazol in which a horse rolled, causing the die he was flipping to hit a table, moving it many feet across the room. Conrad testified that, because he believed A.J. Rose's die flipping procedure to be dangerous, he was on a campaign to correct the problem even before Rallya got hurt.
 {¶ 28} In an affidavit, Conrad averred that he complained to tool room supervisors John Turchik, Craig Cecil and Mike Sikora, and to the plant manager John Demaske, that A.J. Rose's use of metal horses to flip dies was extremely dangerous and that someone was going to get hurt. He averred that no other companies for which he worked used such horses to flip dies. Finally, he averred that he recommended to the tool room supervisors and plant manager an alternate method of using large wooden blocks on the floor to flip dies, but was informed that wooden blocks were too expensive.
 {¶ 29} Mike Sikora, a former tool room manager at A.J. Rose, averred in an affidavit that he observed multiple instances prior to Rallya's accident where the unsecured wheeled horses tipped and shot out during the die flipping procedure. He averred that he believed there to be a 99.9% risk of personal injury and property damage due to the safety concerns he had regarding *Page 12 
the use of the wheeled horses. He averred that he discussed his belief of the risk with Dan Pritchard, Director of Engineering; John Demaske, Plant Manager; Dana Lambilotte, Director of Human Resources; and Mike Rose, General Manager.
 {¶ 30} Several other A.J. Rose employees, including Stanley Klik and William Sharpe, testified during depositions that there was no formal training or written instructions regarding die flipping. Rather, employees were expected to "watch and learn." Mr. Sharpe testified that he believed the use of wheeled horses to flip dies was not safe because they are unstable and can slide. He testified that he and Ed Lege asked tool room supervisor John Turchik six years ago, well before Rallya's accident, for remote controls for the cranes to allow employees the ability to stand further away from the dies while flipping them on the unstable horses. He testified that he was told that remote controls would not be cost effective.
 {¶ 31} Numerous A.J. Rose employees testified regarding their prior experiences flipping dies at other companies. Most testified that no other employer besides A.J. Rose provides wheeled horses for flipping dies. Many employees testified that they were not comfortable with the use of wheeled horses and that they preferred more stable methods, such as flipping on wooden blocks, on the floor or on stationary rails, as done at other companies.
 {¶ 32} In addition, numerous employees testified regarding the uneven weight distribution of some of the heavier dies like 4054. They testified that great care must be used to "choke" the chains used to lift the dies to compensate for the uneven weight distribution. Mr. Sharpe testified that dies will swing if a heavier side hits a horse unevenly. He testified that he has discussed with other employees his belief that horses should be pinned down so they cannot roll under those circumstances. He concluded that he has seen general incidents of horses moving during the die flipping procedure both before and since Rallya's accident. He testified *Page 13 
that he was aware that he may complain regarding safety issues, but he was not aware whether a formal complaint form exists. Sharpe testified that he believed that his request for a remote operated crane constituted an informal safety complaint.
 {¶ 33} William Flanigan, a former tool and die maker and current group leader at A.J. Rose, testified that he has seen dies move horses from the sheer weight of the die. He testified that, since he has worked at A.J. Rose, there has "always been a complaint or two about the die flipping procedure."
 {¶ 34} Although A.J. Rose presented evidence that there have been no formal written safety concerns regarding the use of wheeled horses in the die flipping procedure, Rallya presented evidence that A.J. Rose was aware of employee concerns that the use of unstable, wheeled horses during flipping was dangerous, especially in light of the limited range of movement away from the die during flipping due to the use of a corded crane control. Under these circumstances, Rallya has met its reciprocal burden under Tompkins, supra, to show that a genuine issue of material fact exists regarding whether A.J. Rose knew of the existence of a dangerous process, procedure, instrumentality or condition within its business operation. Specifically, Rallya presented evidence to show that a question exists regarding whether A.J. Rose, through its supervisors, managers, directors and/or owner, was aware that the use of wheeled horses during the die flipping procedure constituted a dangerous process or procedure. Accordingly, the trial court erred by finding that no genuine issue of material fact existed regarding the first prong of theFyffe test.
 {¶ 35} To prevail in regard to the second prong of the Fyffe test, Rallya must demonstrate that A.J. Rose knew that harm to its employees was a substantial certainty if they were subjected to such dangerous process or procedure. Furthermore, mere knowledge and *Page 14 
appreciation of a risk by an employer is not enough to establish intent.Barger v. Freeman Mfg. Supply Co., 9th Dist. No. 03CA008313,2004-Ohio-2248, at ¶ 10, citing Fyffe, 59 Ohio St.3d at paragraph two of the syllabus.
 {¶ 36} Moreover, in order to establish an intentional tort by an employer, a plaintiff must demonstrate proof beyond that required to prove negligence or recklessness. Fyffe, 59 Ohio St.3d at paragraph two of the syllabus. If a plaintiff can show that harm or consequences will follow the risk and that the employer knows that injuries to employees are certain or substantially certain to result from the risk, yet the employer still requires the employee to proceed, the employer is treated by the law as if he had in fact desired the end result. See id. This Court has held that it is the element of substantial certainty which differentiates negligence from an intentional tort. Marks v. GoodwillIndustries of Akron, Ohio, Inc. (Mar. 27, 2002), 9th Dist. No. 20706 (Carr, J., dissenting, in part, upon a finding that a genuine issue of material fact existed as to the element of substantial certainty on the specific facts of the case), citing Van Fossen, 36 Ohio St.3d at 116. "The line must be drawn where the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the [employer] a substantial certainty." (Internal quotations omitted.) Marks, supra.
 {¶ 37} When determining intent, "this Court proceeds on a case-by-case basis and considers the totality of the circumstances." Id. Concerning substantial certainty, we have stated that:
 "Some of the relevant facts and circumstances which support the conclusion that an employer's knowledge that harm to the employee was a substantial certainty include, but are not limited to: prior acts of a similar nature, the employer's concealment or misrepresentations concerning the danger, and federal and/or state safety violations or noncompliance by the employer with industry safety standards." Id. *Page 15 
Furthermore, in order to prove substantial certainty of harm, this Court has held that "a plaintiff must show [that] the level of risk-exposure was egregious." (Quotations omitted). Pintur v. Republic Technologies,Internatl, LLC, 9th Dist. No. 05CA008656, 2005-Ohio-6220, at ¶ 12. This Court has also repeatedly recognized that "[a]n employer cannot be expected to anticipate an employee's actions that lead to an injury where that employee has alternative means of proceeding available to him." Kidder v. Cavanaugh (Jan. 28, 1998), 9th Dist. No. 18343, quotingMcConville v. Jackson Comfort Sys., Inc. (1994), 95 Ohio App.3d 297,303, citing Van Fossen, 36 Ohio St.3d at 118.
 {¶ 38} In this case, there was testimony by numerous employees regarding similar prior incidents where horses moved or "kicked out" during the die flipping process, causing the die to crash to the floor or propel a table across the room. Although there were no prior personal injuries, there was property damage to dies and the floor.
 {¶ 39} "[A]n employer cannot be held to know that harm is substantially certain to occur when it has taken measures that would have prevented the injury altogether had they been followed."Spurlock v. Buckeye Boxes, Inc., 10th Dist. No. 06AP-291,2006-Ohio-6784, at ¶ 10, citing Robinson v. Icarus Indus. Constructing Painting Co. (2001), 145 Ohio App.3d 256, 262. However, numerous employees testified that there was no formal die flipping training at A.J. Rose. Rather, employees merely worked with other tool and die makers and began to flip dies themselves when they felt comfortable. Stanley Klik testified that no one had formal training on flipping, only experience. Lloyd Oppenlander testified that the die maker responsible for a new employee demonstrates how he flips dies but generally employees are left to determine how to flip dies in the way most comfortable for them. The company created the Die Flipping *Page 16 
Safety Guidelines only after Rallya's accident. Even then, the vast majority of employees indicated that they did not understand the procedure set forth in the written guidelines.
 {¶ 40} Rallya and others testified that they were not trained to stand a certain distance away while flipping a die, only that they should stand as far away as possible. There was evidence that the corded crane control limited an employee's ability to move farther than three feet away from the die at times. There was also evidence that an employee's movement and location was limited by the placement or storage of pallets and dies in the tool room where dies were flipped. There was evidence that the weight in certain heavy dies, like 4054, was not distributed evenly, but that employees were left to figure out how best to balance the weight themselves when flipping. Several employees testified that the only way to determine the uneven weight distribution was to notice an imbalance during the flipping process. William Sharpe testified that dies will swing if the heavier side hits a horse unevenly, but that employees do not know that there is a weight imbalance problem until they begin to lift the die and by then it is too late. Based on evidence that A.J. Rose may have failed to provide formal die flipping training or safety training relevant to die flipping, a question remains whether A.J. Rose may have attempted to conceal or misrepresent the dangers associated with flipping dies on wheeled horses.
 {¶ 41} Several employees testified that they could not remember whether safety concerns regarding the use of wheeled horses during the die flipping procedure were raised during tool room or safety team meetings. Some believed they must have been, while others believed the issue was just discussed generally among tool and die makers and supervisors. Cassius Johnson, a machine technician at A.J. Rose, testified that he was on the safety team at the time of Rallya's accident. Johnson testified that the safety team was not given an opportunity to interview *Page 17 
witnesses regarding Rallya's accident based on "past practice" by company management. He testified that company supervisors arrive on the site of an accident but fail to notify the safety committee which then has no opportunity to investigate and determine corrective actions. Although there were no prior formal complaints, Johnson testified that tool room employees complained after Rallya's accident that A.J. Rose's die flipping procedure was unsafe. Specifically, Johnson testified that employees reported problems with uneven horses and with horses moving, shifting or kicking out during the die flipping procedure, especially in cases of uneven weight distribution which allowed the wheels on one side of the horse to continue to touch the ground.
 {¶ 42} Thomas Conrad averred in his affidavit that he cautioned various supervisors and the plant manager prior to Rallya's accident that the use of metal horses was "extremely dangerous and that somebody was going to get hurt." Lloyd Oppenlander, a tool and die maker at A.J. Rose, testified that he, Tom Conrad and "half the tool room" at one time or another talked to supervisors regarding problems with horses kicking out from under dies. He testified that the horses would kick out in two directions, left to right and back to front. He testified that he voiced concerns regarding A.J. Rose's die flipping procedure to Ken Cook, John Turchik and Craig Cecil, asserting that the company's method is a "very dangerous maneuver" and that people can get hurt.
 {¶ 43} Numerous employees testified that other companies employed different, less dangerous procedures for flipping dies, including using wooden blocks on the floor and using two cranes. The general consensus was that the closer to the floor an employee could flip the die, the safer. Although other procedures were proposed, the company rejected the viability of them all. Others testified that the non-wheeled horses at A.J. Rose were not strong enough to *Page 18 
bear the weight of such a die. Accordingly, there is some evidence that Rallya had no real alternative but to use the wheeled horses to flip die 4054.
 {¶ 44} Based on a review of the evidence, Rallya met his reciprocal burden under Tompkins, supra, to show that a genuine issue of material fact exists regarding whether A.J. Rose knew that if employees were subjected to the company's die flipping procedure using wheeled horses that harm to the employees would be a substantial certainty. There were prior incidents of dies falling and causing property damage, if not personal injuries. There is evidence that numerous employees discussed their concerns about the safety of the use of wheeled horses to flip dies, especially those with uneven weight distribution, and that many employees expressed their beliefs that someone would be injured by the process. Significantly, Mike Sikora averred that he informed the Directors of Engineering and Human Resources, as well as the plant and general managers, that there was a 99.9% chance that someone would be injured using the die flipping procedure at A.J. Rose. Accordingly, the trial court erred by finding that no genuine issue of material fact existed in regard to the second prong of the Fyffe test.
 {¶ 45} To prevail on the third prong of the Fyffe test, Rallya must demonstrate that A.J. Rose required him to continue to perform the dangerous task under the circumstances and with knowledge of substantial certainty of harm. "Evidence that an employer implicitly required an employee to engage in a dangerous task may satisfy the third prong ofFyffe." Spurlock at ¶ 6, citing Hannah v. Dayton Power Light Co.
(1998), 82 Ohio St.3d 482, 487. Rallya can satisfy the third prong "by presenting evidence that raises an inference that the employer, through its actions and policies, required the [injured employee] to engage in that dangerous task." Id. The Ohio Supreme Court has stated that "a jury issue arises concerning the third element of the Fyffe test when sufficient credible evidence is presented that the employer merely expected the *Page 19 
employee to engage in a dangerous task." Gibson at ¶ 24, citingHannah, 82 Ohio St.3d at 487. This Court recognizes that the availability of alternative means of proceeding is also a valid consideration in regard to the third prong. Kidder, supra.
 {¶ 46} In its motion for summary judgment, A.J. Rose argued that it neither required nor expected that Rallya would be standing "in the zone of danger" when the horse "kicked out" and the die fell on his foot. A.J. Rose argued that Rallya had been trained to stand to the side of the die when flipping, never to the front. The company argued that, because Rallya was injured when he was standing in front of the die against company training and policy, he cannot prevail on his claim.
 {¶ 47} Rallya testified that Mike Sikora assigned him to work on die 4054 the day of the accident. He testified that "I can't really question what he [Sikora] tells me to do."
 {¶ 48} Rallya testified during his deposition that he generally stood to the side of the die when flipping it. In this case, he testified, "I wasn't standing in front of the die. I was standing off to the left of the front of the die but in front of the die, if that's, yeah." He further testified that he remained in the same corner the whole time because he had to reposition his second set of horses once the die was lowered to a certain point. He testified that the corded control prevented him from moving more than three feet away.
 {¶ 49} Again, numerous employees testified that there was no formal die flipping training. Not even the Die Flipping Safety Guidelines, published after Rallya's accident, direct employees to stand to the side of the die as opposed to the front when flipping. Rather, the guidelines direct employees only to "stand at least six feet away from the die and have a clear escape route." Robert Beck testified that the Die Flipping Safety Guidelines were no different *Page 20 
than prior company policy which was merely reduced to writing for filing as the official training document.
 {¶ 50} A.J. Rose asserts that standing in front of a die while flipping it constitutes a "zone of danger." However, Tom Conrad testified that horses could kick out from under dies either left to right or front to back, indicating that dies could then swing in any direction, making any location a potential "zone of danger."
 {¶ 51} Under the circumstances, Rallya has met his reciprocal burden under Tompkins, supra, to show that a genuine issue of material fact existed regarding whether A.J. Rose required him to continue to perform the dangerous task. Flipping dies was a necessary part of his work as a tool and die maker. He, along with other tool and die makers, received no formal die flipping training. Not only was he never directed to stand in any particular place when flipping a die, there is no evidence that the company ever identified a "zone of danger" to any employee. Rather, employees testified that they were left to determine for themselves how best to position themselves, the horses and the dies when flipping. Accordingly, the trial court erred by finding that no genuine issue of material fact existed in regard to the third prong of the Fyffe test.
 {¶ 52} A.J. Rose presented evidence in support of its arguments on all three prongs of the Fyffe test, thereby meeting its initial burden underDresher. Rallya, however, presented his own evidence on all three prongs of Fyffe, thereby meeting his reciprocal burden under Tompkins. Based on this Court's de novo review of all the evidence properly submitted, there was sufficient evidence to show that genuine issues of material fact exist in regard to all three elements of Fyffe. Accordingly, the trial court erred by granting summary judgment in favor of A.J. Rose on Rallya's claim. Rallya's assignment of error is sustained. *Page 21 
 III. {¶ 53} Rallya's sole assignment of error is sustained. The judgment of the Lorain County Court of Common Pleas is reversed and the cause remanded for further proceedings consistent with this opinion.
Judgment reversed, and cause remanded.
[1] Although the majority shares the concern of the concurring judge regarding the apparently unopened transcripts, we, nonetheless, are ill equipped to determine whether or not the trial court read the transcripts without considering evidence outside of the appellate record.
[2] The prior version of R.C. 2745.01 had been held to be unconstitutional. Johnson v. BP Chems., Inc. (1999), 85 Ohio St.3d 298, syllabus. By the date of this decision, three courts have also held the current version of R.C. 2745.01 to be unconstitutional. Kaminski v.Metal Wire Prods. Co., 175 Ohio App.3d 227, 2008-Ohio-1521, at ¶ 36
(Seventh District Court of Appeals); Barry v. A.E. Steel Erectors,Inc., 8th Dist. No. 90436, 2008-Ohio-3676, at ¶ 21-27; Fleming v. AASServ., Inc., 177 Ohio App.3d 778, 2008-Ohio-3908, at ¶ 40 (Eleventh District Court of Appeals). Furthermore, the question of the constitutionality of R.C. 2745.01, as amended by Senate Bill 80, effective April 7, 2005, has been certified to the Ohio Supreme Court.Stetter v. R.J. Corman Derailment Servs., L.L.C., 119 Ohio St.3d 1405,2008-Ohio-3880.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellee.
 MOORE, J. CONCURS *Page 22