[Cite as *Nazareth Deli, L.L.C. v. John W. Dawson Ins., Inc.*, 2022-Ohio-3994.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Nazareth Deli LLC et al., | : | |
| Plaintiffs-Appellants, | : | |
| v. | : | No. 21AP-394 (C.P.C. No. 18CV-10044) |
| John W. Dawson Insurance Inc. et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on November 8, 2022

**On brief:** *Scott Elliot Smith, L.P.A., Scott E. Smith*, and *Michael L. Dillard, Jr.*, for appellants. **Argued:** *Scott E. Smith*.

**On brief:** *Marshall Dennehey Warner Coleman & Goggin*, and *Ray C. Freudiger*, for appellees. **Argued:** *Ray C. Freudiger*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiffs-appellants Hany Baransi and Nazareth Deli LLC ("Nazareth Deli") appeal from a judgment of the Franklin County Court of Common Pleas granting the motion for summary judgment filed by defendants-appellees John W. Dawson Insurance Inc. ("Dawson Insurance") and Michael D. Palmer denying appellants' motion for summary judgment, and granting appellees' motion to strike affidavits. For the reasons which follow, we affirm in part and reverse in part, and remand the case to the trial court.

## I. Facts and Procedural History

{¶ 2} On December 3, 2018, appellants filed a complaint alleging claims of negligence, breach of fiduciary duty, and negligent misrepresentation. The claims

concerned a commercial automobile insurance policy Palmer procured for Nazareth Deli from Grange Mutual Casualty Company ("Grange").  Appellants alleged that appellees failure to secure uninsured/underinsured motorist ("UIM") coverage on the policy precluded appellants "from fully recovering Baransi's collision-related damages," resulting from a December 6, 2016 motor vehicle accident.  (Compl. at ¶ 15.)

{¶ 3}  Baransi is the owner of Nazareth Deli, a restaurant which has been operating in Columbus, Ohio since 1989.  Baransi met Palmer in the mid-1990s, and Palmer eventually became a regular customer at Nazareth Deli.  The restaurant was located one-quarter mile away from the offices of Dawson Insurance, where Palmer was employed as a licensed insurance agent.  Baransi would often talk to Palmer when he came into the restaurant and the two men developed a friendship.  Baransi and Palmer had lunch together once, and the two men and their wives had dinner together once.

{¶ 4}  In the 2000s, Palmer began procuring insurance for Baransi. Palmer eventually provided Baransi with personal auto, homeowners, and commercial policies of insurance.  Baransi stated he told Palmer he wanted "the best, the most coverage on anything," while Palmer stated Baransi asked him "to give him a good rate and make sure that the limits were appropriate."  (Baransi Depo. at 71; Palmer Depo. at 56.)

{¶ 5}  In 2004, Baransi and his wife Kim obtained a personal auto insurance policy from Palmer written by Grange.  The vehicles on the 2004 personal auto policy were a 1995 Pontiac, a 1998 BMW, and a 2000 Volvo.  The policy had matching liability and UIM coverage limits of $100,000 per person and $300,000 per accident for each vehicle on the policy.[1]  Dawson Insurance had a general rule of providing customers with matching liability and UIM coverage limits on auto policies.

{¶ 6}  In 2006, Palmer procured a commercial insurance policy for Nazareth Deli written by Grange.  The commercial policy, which was in effect from October 24, 2006 to October 24, 2007, included general liability coverage, property coverage, and commercial auto coverage.  The commercial auto portion of the policy provided liability coverage of $300,000 per accident for covered auto symbol 1, and UIM coverage of $300,000 per

---

[1] John Dawson, the president of Dawson Insurance, stated his agency generally recommends liability and UIM limits on personal auto policies of $100,000 per person/$300,000 per accident, as that amount "provides very adequate protection for most people." (Dawson Depo. at 99.)

accident for covered auto symbol 2. (Baransi Depo., Ex. F.) Covered auto symbol "1" referred to "[a]ny '[a]uto,' " while covered auto symbol "2" referred to "[o]nly those 'autos' you own." (Baransi Depo., Ex. I.) The policy defined "you" as the "[n]amed [i]nsured shown in the [d]eclarations." (Baransi Depo., Ex. I.) Nazareth Deli was the named insured shown on the declarations of the commercial policy. The 2006-07 commercial auto policy listed a 1997 Ford F150 as the sole covered auto owned by Nazareth Deli.

{¶ 7} Palmer explained that the insurance policies automatically renewed "at the same numbers" each year unless the client asked for changes. (Palmer Depo. at 70.) Baransi stated he was the "[o]nly" person at Nazareth Deli who made decisions regarding insurance. (Baransi Depo. at 114.)

{¶ 8} In 2009, Baransi removed the 1997 F150 from the commercial auto policy, and added a 2002 Ford Explorer and Kim as an additional insured to the commercial auto policy. As such, the 2002 Explorer became the sole covered auto owned by Nazareth Deli on the commercial auto policy, and the policy continued to provide liability coverage of $300,000 per accident for any auto and UIM coverage of $300,000 per accident for covered autos owned by Nazareth Deli. Baransi explained that Kim, who also worked at Nazareth Deli, was "the main driver" of the 2002 Explorer. (Baransi Depo. at 124.)

{¶ 9} In December 2012, Baransi purchased a 2012 Mazda 3 and informed Palmer of the purchase. Effective December 3, 2012, Palmer added the Mazda to Baransi's personal auto policy. The personal auto policy also provided coverage for the 2000 Volvo at this time, and continued to provide matching liability and UIM coverage limits of $100,000 per person and $300,000 per accident for each vehicle on the policy. When Baransi was asked if he bought the Mazda as a personal vehicle, he responded "I had no personal reasons. My life was my restaurant." (Baransi Depo. at 160.) Baransi stated he drove both the "Mazda and the Ford" for work in December 2012. (Baransi Depo. at 177-78.)

{¶ 10} Around 2014, Nazareth Deli moved to a new location. The restaurant's lease agreement at the new location required it carry $1 million in insurance coverage. Baransi let Palmer know about the new lease requirements, and Palmer procured a commercial policy from Grange with coverage limits of $1 million. As such, the commercial auto policy in effect from October 24, 2014 to October 24, 2015 provided liability coverage of $1 million per accident for any auto and UIM coverage of $1 million for covered autos owned by

Nazareth Deli. The 2014-15 commercial auto policy identified the 2002 Explorer as the sole covered auto owned by Nazareth Deli.

{¶ 11} In 2015, Baransi removed the 2002 Explorer and Kim from the commercial auto policy and added a 2005 Ford Explorer to the policy. As issued on October 24, 2015, the commercial auto policy continued to provide $1 million in liability coverage for any auto and $1 million in UIM coverage for covered autos owned by Nazareth Deli, and identified the 2005 Explorer as the sole covered auto owned by Nazareth Deli. Baransi affirmed he used the 2005 Explorer in connection with his business.

{¶ 12} Baransi and Kim divorced in August 2016 and Kim took possession of the 2005 Explorer during the divorce proceedings. In March 2016, Palmer texted Baransi to ask if he should remove the 2005 Explorer from the commercial auto policy as Kim had the vehicle. Baransi responded "[y]es * * * [t]ake Kim out of anything and everything. Separate us completely." (Baransi Depo., Ex. N.) On June 2, 2016, after Kim obtained a personal auto policy for the 2005 Explorer from Dawson Insurance, Palmer sent Baransi a form to complete the removal of the 2005 Explorer from the commercial auto policy. Baransi executed the form and the 2005 Explorer was removed from the commercial auto policy effective June 1, 2016. Baransi received a pro rata premium return resulting from the removal of the 2005 Explorer.

{¶ 13} After June 2016, there was no covered auto listed on the commercial auto policy. Palmer stated he "asked" Baransi "if he was going to put another vehicle onto the commercial policy," and Baransi told Palmer, "not at this time." (Palmer Depo. at 103.) The commercial auto policy in effect from June 2016 to October 2016 continued to provide $1 million in liability coverage for any auto, but did not provide UIM coverage for any auto. The commercial auto policy in effect from October 24, 2016 to October 24, 2017 did not list a covered auto owned by Nazareth Deli and did not provide UIM coverage for any auto. As such, Nazareth Deli was not obligated to pay a premium for UIM coverage under the 2016-17 commercial auto policy, as it was under previous policies. The 2016-17 commercial auto policy provided $1 million in liability coverage for covered auto symbols "8" and "9," which applied to non-owned and hired autos Nazareth Deli used in connection with its business. (Baransi Depo., Ex. O.) In 2016, Baransi had possession of the Mazda and the 2002 Explorer.

{¶ 14} On December 6, 2016, Baransi was in a motor vehicle accident with an underinsured motorist while driving the Mazda for work. Baransi suffered severe injuries in the accident. Baransi sought to collect UIM benefits under the commercial auto policy following the accident, but Grange denied the claim. Although Baransi was driving the Mazda at the time of the accident, he stated he could have been driving the 2002 Explorer because "some days [he] dr[o]ve that." (Baransi Depo. at 176.) Baransi claimed Palmer "knew" he drove the Mazda primarily for work; Palmer affirmed he "knew that [Baransi] used his vehicle for business purposes." (Baransi Depo. at 177-78; Palmer Depo. at 114.)

{¶ 15} Baransi acknowledged he received his insurance policies, but repeatedly stated he never read his policies. Palmer would take the policies "out to [the Baransis] sometimes and review it with them," but acknowledged he did not "know if they read anything of those policies." (Palmer Depo. at 57.)

{¶ 16} Palmer stated that, when Baransi instructed him to remove the 2005 Explorer from the commercial auto policy, he explained to Baransi "that the only coverage still being provided on the Nazareth policy was higher[ed] and unowned, so it would cover his personal vehicles being used for third party liability," and Baransi "was now covered for everything other than liability for Nazareth on his personal auto policy." (Palmer Depo. at 107-09.) Baransi averred that Palmer "did not advise [him], and [he] did not know that [his] other cars were not covered under the business auto insurance or that [Palmer] dropped the business auto [UIM] until after the [December 2016] collision." (Baransi Aff. at ¶ 20.) Baransi claimed he "didn't know [the Mazda] wasn't" a covered auto on the commercial auto policy, and asserted that Palmer always told him, "you're covered, everything is okay, a million dollars, you don't have to worry about anything with insurance." (Baransi Depo. at 175, 207.)

{¶ 17} On August 10, 2020, appellees filed a Civ.R. 56 motion for summary judgment. Appellees argued appellants' claims accrued on December 3, 2012 when the Mazda was added to Baransi's personal auto policy, and that appellants' claims were barred by the four-year statute of limitations in R.C. 2305.09(D). Appellees further asserted Palmer had not breached a duty of care, that no fiduciary relationship existed, and Palmer made no negligent misrepresentation of fact.

{¶ 18} Appellants filed a memorandum contra appellees' motion for summary judgment on November 16, 2020.  Appellants asserted their claims did not pertain to "Palmer's errors occur[ing] in 2012" or to "Baransi's personal policy at all."  (Appellants' Memo Contra at 19.)  Rather, appellants explained their claims accrued in "June 2016" when Palmer "failed to tell" Baransi about the "problem or gap" in the UIM coverage under the commercial auto policy and "failed to recommend fixing the gap" at that time. (Appellants' Memo Contra at 18-20.)  Appellants alternatively asserted that, pursuant to *Kunz v. Buckeye Union Ins. Co.*, 1 Ohio St.3d 79 (1982), their claims accrued at the time of the December 6, 2016 accident.  Appellants argued Palmer breached both his fiduciary and ordinary duties of care, and that Palmer negligently misrepresented to Baransi he was "covered in 'every single possible way you can think of,' " was "fully covered for $1 million," and "the policy was to always match limits of liability with limits of UIM coverage." (Appellants' Memo Contra at 24-27, 30-31, fn. 4.)

{¶ 19} On November 9, 2020, appellants filed a Civ.R. 56 motion for summary judgment.  Appellants asked the court to enter "summary judgment against tortfeasor Ronnie Horn who was negligent and solely caused the" December 6, 2016 accident, and further asked the court to find that Baransi was "not comparatively negligent" and "was injured as set forth in the affidavits of the medical experts."  (Appellants' Mot. for Sum. Jgmt. at 1.)  Appellants submitted affidavits from Drs. Delaney Smith and Aaron Fritz detailing injuries Baransi sustained as a result of the motor vehicle accident.  On December 7, 2020, appellees filed a memorandum contra appellants' motion for summary judgment and a motion to strike the affidavits of Drs. Smith and Fritz.

{¶ 20} On July 15, 2021, the trial court issued a decision and entry granting appellees' motion for summary judgment, denying appellants' motion for summary judgment, and granting appellees' motion to strike the doctors' affidavits.  The court found appellants' negligence claim barred by the four-year statute of limitations in R.C. 2305.09(D), and found no genuine issue of material fact as to either appellants' breach of fiduciary duty or negligent misrepresentation claims.

## II.  Assignments of Error

{¶ 21} Appellants appeal and assign the following six assignments of error for our review:

[I.] The Trial Court erred when it held that Defendants John W. Dawson Insurance Inc. ("Dawson" or "Dawson Insurance") and Michael Palmer ("Palmer") (and collectively, "Appellees") did not owe a fiduciary duty to Appellants.

[II.] The Trial Court erred when it held that the statute of limitations barred the claims of Appellants Hany Baransi ("Baransi") and Nazareth Deli LLC ("Nazareth Deli" or "Nazareth") (and collectively, "Appellants").

[III.] The Trial Court erred when it found that Palmer made no misrepresentations to [Appellants].

[IV.] The Trial Court erred when it denied Appellants' Motion for Summary Judgment as to the underlying liability and injuries sustained.

[V.] The Trial Court erred in granting Appellees' Motions to Strike Affidavits.

[VI.] The Trial Court erred in denying Appellants' Motion to Compel the Continuance of the Ohio R. Civ. P. 30(B)(5) deposition of Dawson Insurance corporate representative John W. Dawson.

## III.  Standard of Review on Motions for Summary Judgment

{¶ 22} An appellate court reviews a grant of summary judgment under a de novo standard.  *Capella III*, *L.L.C. v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001).  "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotations and citations omitted.) *Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9.  Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made.  Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).  In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the non-moving party.  *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No.

18AP-736, 2019-Ohio-4015, ¶ 6, citing *Pilz v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-240, 2004-Ohio-4040, ¶ 8.

{¶ 23} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the moving party fails to satisfy its initial burden, the court must deny the motion for summary judgment; however, if the moving party satisfies its initial burden, summary judgment is appropriate unless the non-moving party responds, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Id.*; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 12, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991).

{¶ 24} For ease of analysis, we address appellants' second assignment of error first.

**IV. Second Assignment of Error – Statute of Limitations**

{¶ 25} Appellants' second assignment of error asserts the trial court erred in finding their negligence claim barred by the statute of limitations. Relying on *LGR Realty, Inc. v. Frank & London Ins. Agency*, 152 Ohio St.3d 517, 2018-Ohio-334, and *Auckerman v. Rogers*, 2d Dist. No. 2011-CA-23, 2012-Ohio-23, the trial court held appellants' negligence claim accrued on December 3, 2012 when the Mazda was added to the personal auto policy. The court concluded it "was at this time [appellants] were injured by the commercial policy failing to provide UIM coverage as the policy specifically excluded coverage for the 2012 Mazda." (Decision at 10.)

{¶ 26} Appellants contend, as they did in the trial court, that their negligence claim accrued in June 2016 when Palmer removed the 2005 Explorer from the commercial auto policy and allegedly failed to inform Baransi he no longer had UIM coverage under the commercial auto policy or offer Baransi options regarding how to fix the lack of UIM coverage. Appellants alternatively rely on *Kunz* to contend their cause of action accrued on December 6, 2016 when Baransi was injured in the motor vehicle accident. Regardless of whether their negligence claim accrued in June or December 2016, appellants assert their claim does not concern "the policy written in 2012." (Appellants' Brief at 42.)

{¶ 27} Statutes of limitation are intended to "serve a gate-keeping function for courts." *Flagstar Bank, F.S.B. v. Airline Union's Mtge. Co.*, 128 Ohio St.3d 529, 2011-Ohio-1961, ¶ 7.[2]  Statutes of limitation "are remedial in nature and are to be given a liberal construction to permit cases to be decided upon their merits, after a court indulges every reasonable presumption and resolves all doubts in favor of giving, rather than denying, the plaintiff an opportunity to litigate." *Id.* at ¶ 7, citing *Draher v. Walters*, 130 Ohio St. 92 (1935).

{¶ 28} The issue of which statute of limitation applies to a cause of action presents a question of law which appellate courts review de novo. *Harris v. Cunix*, 10th Dist. No. 21AP-13, 2022-Ohio-839, ¶ 9, citing *Timbuk Farms, Inc. v. Hortica Ins. & Emp. Benefits*, 5th Dist. No. 2021 CA 00017, 2021-Ohio-4141, ¶ 50. *Accord Potter v. Cottrill*, 4th Dist. No. 11CA685, 2012-Ohio-2417, ¶ 9.  Appellants, however, do not dispute that the four-year statute of limitations in R.C. 2305.09(D) applies to their negligence claim.  *See* R.C. 2305.09(D) (providing that an action "[f]or an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 1304.35, 2305.10 to 2305.12, and 2305.14 of the Revised Code," shall be brought "within four years after the cause thereof accrued"); *Mason v. Bowman*, 10th Dist. No. 09AP-995, 2010-Ohio-2325, ¶ 9 (holding that, pursuant to R.C. 2305.09(D), "the statute of limitations for a negligence claim is four years"); *LGR Realty* at ¶ 11 (stating "R.C. 2305.09(D) provides a four-year statute-of-limitations period for tort actions not specifically covered by other sections of the Revised Code").  Rather, appellants contest the trial court's conclusion regarding when their negligence claim accrued.

{¶ 29} "Generally, a cause of action accrues at the time the wrongful act is committed." *Harris v. Liston*, 86 Ohio St.3d 203, 205 (1999).  *Accord Flagstar Bank* at ¶ 13; *LGR Realty* at ¶ 14, quoting *Kerns v. Schoonmaker*, 4 Ohio 331 (1831), at syllabus (stating the court has "long recognized that a '[s]tatute of limitations commences to run so soon as the injurious act complained of is perpetrated, although the actual injury is subsequent' ").  In certain situations, however, strict application of the general rule can lead to an unjust result.  *Harris*, 86 Ohio St.3d at 205-06; *O'Stricker v. Jim Walter Corp.*, 4

---

[2] *See also Pratte v. Stewart*, 125 Ohio St.3d 473, 2010-Ohio-1860, ¶ 42 (explaining that statutes of limitations (1) ensure fairness to the defendant, (2) encourage prompt prosecution of causes of action, (3) suppress stale and fraudulent claims, and (4) avoid the inconvenience engendered by delay, including the difficulties of proof present in older cases).

Ohio St.3d 84, 87 (1983).  As such, two primary exceptions to the general rule regarding when a claim accrues exist: the discovery rule and the delayed-damage rule.  *LGR Realty* at ¶ 14-16.

{¶ 30} The discovery rule provides that a cause of action does not arise until the plaintiff knows, or by the exercise of reasonable diligence should know, that he or she has been injured by the defendant's conduct.  *Flagstar Bank* at ¶ 14, citing *Collins v. Sotka*, 81 Ohio St.3d 506, 507 (1998); *Harris*, 86 Ohio St.3d at 206.  "Under the delayed-damages rule, 'where the wrongful conduct complained of is not presently harmful, the cause of action does not accrue until actual damage occurs.' "  *Flagstar Bank* at ¶ 19, quoting *Velotta v. Leo Petronzio Landscaping, Inc.*, 69 Ohio St.2d 376, 379 (1982).

{¶ 31} In *Kunz*, the Supreme Court of Ohio applied the delayed damages rule to a cause of action alleging negligent procurement of an insurance policy.  The insurance agent in *Kunz* secured an insurance policy for an insured in 1969 which provided all-risk coverage on a crane.  In 1970, the agent provided the insured with a single consolidated policy, which the insured believed provided the same type of all-risk coverage.  *Id*. at 79.  The crane was damaged in 1975, and the insurer denied the insured's claim for coverage citing exclusionary provisions in the consolidated policy which did not exist in the 1969 policy.  *Id*.  The Supreme Court held that the insured's negligent procurement claim against its insurance agent accrued in 1975 when the crane was damaged.  *Id*. at 81.  The court observed that, because a " 'tort is ordinarily not complete until there has been an invasion of a legally protected interest of the plaintiff[,] * * * there must be an injury or harm to [a plaintiff] as a consequence of [a defendant's] negligence to serve as a basis for recovery of damages before * * * the period of limitation commenced to run.' "  *Id*. at 81, quoting *Austin v. Fulton Ins. Co.*, 444 P.2d 536 (Alaska 1968).  As such, the court found "no invasion, or infringement upon or impairment of [the insured's] interest until there had been a loss to [the insured's] equipment because until that event occurred [the insurance] protection could avail [the insured] nothing."  *Id*. at 81-82.

{¶ 32} Since *Kunz*, however, the Supreme Court has refused to apply the delayed damages rule to claims of professional negligence.  In *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176 (1989), the court held that a claim of professional negligence against an accounting firm "commenced to run when the allegedly negligent act was committed," and

not at the time the injury was discovered. *Id.* at 182. *Accord Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161-62 (1991) (following *Investors REIT*); *Fronczak v. Arthur Andersen, L.L.P.*, 124 Ohio App.3d 240, 243 (10th Dist.1997) (holding that, pursuant to *Investors REIT* and *Thornton*, the appellant's "accountant negligence claims accrued when the allegedly negligent conduct was committed"). In *Flagstar Bank*, the court held neither the discovery rule nor the delayed damages rule applies to claims of professional negligence, as such claims "accrue[] when the allegedly negligent act is committed." *Id.* at ¶ 25. The *Flagstar Bank* court concluded that a claim of professional negligence against an appraiser accrued when the alleged negligent act occurred, i.e., at the time the allegedly negligent appraisal occurred, and not when a bank was subsequently injured by the appraisal. *Id.* at ¶ 21, 27, 30.

{¶ 33} Since *Investors REIT* and *Flagstar Bank*, appellate courts have struggled to determine whether the holding in *Kunz* remains viable. *Compare Auckerman*[3] at ¶ 17 (holding that *Flagstar Bank* "implicitly overruled" *Kunz*); *with Vinecourt Landscaping, Inc. v. Kleve*, 11th Dist. No. 2013-G-3142, 2013-Ohio-5825, ¶ 24-26 (stating the court would not "discard[] *Kunz* without an express pronouncement by the Supreme Court," and applying *Kunz* to hold that the statute of limitations began to run when the insureds sustained a loss resulting from a fire on their property). *See also Chateau Estate Homes, L.L.C. v. Fifth Third Bank*, 1st Dist. No. C-160703, 2017-Ohio-6985, ¶ 22 (refusing to follow *Vinecourt Landscaping* and instead following *Auckerman* to find *Kunz* implicitly overruled).

{¶ 34} In *LGR Realty*, the Supreme Court held that the delayed damages rule did not apply to a cause of action alleging negligent procurement of an insurance policy. *Id.* at ¶ 1. The insurance agent in *LGR Realty* procured a professional liability insurance policy for a client in 2010, and the policy contained a specific-entity-exclusion provision. *Id.* at ¶ 2-3. The client made a claim against the policy for coverage and the insurer denied the

---

[3] In *Auckerman*, which the trial court relied on, the plaintiff filed suit against her insurance agent alleging negligent procurement, as her auto insurance policy failed to include UIM coverage despite the plaintiff's request for full coverage. *Id.* at ¶ 2-3. The plaintiff obtained her insurance policy in 2005, was involved in an accident with an underinsured motorist in 2008, and filed suit against her insurance agent in 2010. *Id.* at ¶ 3-4. The court held that, pursuant to *Flagstar Bank* and *Investors REIT*, "the statute of limitations began to run on Auckerman's negligent-procurement claim when she obtained her insurance policy." *Id.* at ¶ 18. The court noted that while *Flagstar Bank* "involved an appraiser's professional negligence," there was "no principled reason why an insurance agent's professional negligence should be treated differently." *Id.*

claim based on the specific-entity-exclusion provision. *Id*. at ¶ 3-4. The court held the client's cause of action "accrued, that is, LGR's injury occurred, when [the insurance agent] issued to LGR the professional-liability insurance policy that specifically excluded coverage for [certain] claims." *Id*. at ¶ 27. The court held that, if LGR "was injured by the insurance policy containing the specific-entity-exclusion provision provided by [the insurance agent], then LGR was damaged the moment it entered into the contract and became obligated to pay a premium for a professional-liability insurance policy that was less than the coverage that it believed it would receive." *Id*. at ¶ 28.

{¶ 35} The plurality decision in *LGR Realty* refused to overrule *Kunz*, finding *Kunz* distinguishable on its facts. *Id*. at ¶ 30, 24. The concurring opinion in *LGR Realty*, however, held that *LGR Realty* and *Kunz* could not "both be the law," and stated that *Kunz* had "been overruled." *LGR Realty* at ¶ 44, 46 (DeWine, J., concurring).

{¶ 36} Considering the foregoing authorities, we find the general rule regarding claim accrual applicable in the present case. As such, appellants' negligence claim accrued "when the allegedly negligent act [was] committed." *Flagstar Bank* at ¶ 25. In assessing when the allegedly negligent act was committed, we focus on the grounds of appellants' negligence claim. *Compare Peterson v. Teodosio*, 34 Ohio St.2d 161, 173 (1973) (holding the "ground of the action and the nature of the demand determine which statute of limitation is applicable"); *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984).

{¶ 37} Appellants do not contend Palmer negligently placed the Mazda on the personal auto policy, rather than the commercial auto policy, when Baransi originally acquired the Mazda in 2012. Indeed, pursuant to *LGR Realty*, such a claim would be time-barred. Rather, appellants contend their negligence claim pertains to Palmer's acts, or omissions,[4] in June 2016, when Palmer allegedly failed to explain the lack of UIM coverage to Baransi or offer Baransi options regarding how to maintain the UIM coverage on the commercial auto policy following the removal of the 2005 Explorer. In *LGR Realty*, the client alleged their insurance agent negligently procured the professional-liability insurance policy as written in 2010. Appellants do not contend Palmer negligently

---

[4] *See Reinke Mfg. Co., Inc. v. Hayes*, 256 Neb. 442, 452 (1999) (stating that in Nebraska, "a professional negligence suit accrues at the time of the act or omission causing injury"); *Packgen, Inc. v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 209 A.3d 116, 2019 ME 90, ¶ 1, quoting 14 M.R.S. § 752.

procured the commercial auto policy as originally written, but rather that Palmer failed to take certain actions in response to changes to the policy in 2016. Accordingly, appellants' negligence claim accrued in June 2016 and was not barred by the four-year statute of limitation in R.C. 2305.09(D).[5]

{¶ 38} Appellees assert that, even if we find the statute of limitations does not bar appellants' negligence claim, they are "entitled to summary judgment because Appellants cannot satisfy the elements needed to establish a negligence claim."[6] (Appellees' Brief at 58.) However, as the trial court granted appellees' summary judgment on appellants' negligence claim based solely on the statute of limitations bar, we will not address the merits of appellants' negligence claim in the first instance on appeal. *See Ochsmann v. Great Am. Ins. Co.*, 10th Dist. No. 02AP-1265, 2003-Ohio-4679, ¶ 21, citing *Mills-Jennings of Ohio, Inc. v. Dept. of Liquor Control*, 70 Ohio St.2d 95, 99 (1982) (holding it is "well-established that questions not considered by a trial court will not be ruled upon by [the appellate] court"); *Min You v. N.E. Ohio Med. Univ.*, 10th Dist. No. 19AP-733, 2020-Ohio-4661, ¶ 31; *Baker v. Scheetz*, 10th Dist. No. 18AP-655, 2019-Ohio-685, ¶ 11; *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 360 (1992); *Tree of Life Church, FWC v. Agnew*, 7th Dist. No. 12 BE 42, 2014-Ohio-878, ¶ 27. *See also State v. Edwards*, 119 Ohio App.3d 237, 240 (8th Dist.1997) (noting that "the likelihood of success on the merits" was not a question "before [the appellate court] as [the court's] review here [was] limited to the question of when the statute of limitations commenced"). On remand, the trial court shall consider appellants' negligence claim in the first instance.

{¶ 39} Based on the foregoing, appellants' second assignment of error is sustained.

---

[5] Appellants alternatively assert that "Baransi's personal and commercial policies renewed each year constituting continuous annual wrongful conduct that would restart the statute of limitations each time." (Appellants' Brief at 47.) Appellants presented this argument in a footnote in their memorandum contra appellees' motion for summary judgment. (Appellants' Memo Contra at 21, fn. 2.) However, because appellants' claims are that Palmer engaged in specific negligent conduct in June 2016, the annual renewals of appellants' insurance policies are irrelevant to the accrual question in the present case. *See E. Liverpool v. Owners Ins. Co.*, 7th Dist. No. 20 CO 0009, 2021-Ohio-1474, ¶ 84-87 (noting that *LGR Realty* did "not indicate if there is a distinction between a renewal or original issuance" of an insurance policy, but finding no need to resolve the issue in that case); *Dixon v. Professional Staff Mgt.*, 10th Dist. No. 01AP-1332, 2002-Ohio-4493, ¶ 25-29.

[6] Appellees assert that Palmer was under "no duty to unilaterally find a specific type of coverage, without such a request from the insured," and that Baransi's failure to read his insurance policies prevents appellants from establishing their negligence claim. (Appellees' Brief at 22, 46-50.)

## V. First Assignment of Error – Breach of Fiduciary Duty

{¶ 40} Appellants' first assignment of error asserts the trial court erred in holding appellees did not owe a fiduciary duty to appellants. The trial court noted evidence demonstrating the personal relationship between Palmer and Baransi, but concluded "[h]aving a personal relationship with a client does not elevate to a fiduciary relationship." (Decision at 10-11.) The court also noted that Baransi's "mere reliance on [appellees was] not sufficient to establish a fiduciary relationship." (Decision at 11.) As such, the court found no genuine issue of material fact as to appellants' breach of fiduciary duty claim.[7]

{¶ 41} "The elements for a breach of fiduciary duty include: '(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom.' " *Patel v. Univ. of Toledo*, 10th Dist. No. 16AP-378, 2017-Ohio-7132, ¶ 47, quoting *Wells Fargo Bank, N.A. v. Sessley*, 188 Ohio App.3d 213, 2010-Ohio-2902, ¶ 36 (10th Dist.). *See Strock v. Pressnell*, 38 Ohio St.3d 207, 216 (1988) (observing "[a] claim of breach of a fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care"). Thus, "[w]here there is no fiduciary relationship between the parties, a breach of fiduciary claim necessarily fails." *Patel* at ¶ 47, citing *Waffen v. Summers*, 6th Dist. No. OT-08-034, 2009-Ohio-2940, ¶ 41.

{¶ 42} A fiduciary relationship is a relationship " 'in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 16, quoting *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115 (1974). A fiduciary "has a duty, created by its undertaking, to act primarily for the benefit of another in matters connected with its undertaking." *Cristino v. Admr., Ohio Bur. of Workers' Comp.*, 10th Dist. No. 12AP-60, 2012-Ohio-4420, ¶ 17, citing *State v. Massien*, 125 Ohio St.3d 204, 2010-Ohio-1864, ¶ 35. *Accord Groob* at ¶ 16; *Strock* at

---

[7] Although the four-year statute of limitations in R.C. 2305.09(D) also applies to claims of breach of fiduciary duty, the trial court did not address whether the statute of limitations barred appellants' breach of fiduciary duty claim. *See Blank v. Bluemile, Inc.*, 10th Dist. No. 20AP-200, 2021-Ohio-2002, ¶ 32, fn. 8, citing R.C. 2305.09(D) (stating that "Ohio's statute of limitations for a claim for breach of fiduciary duty is four years"); *Helman v. EPL Prolong, Inc.*, 139 Ohio App.3d 231, 249 (7th Dist.2000). However, as appellants contend Palmer breached his alleged fiduciary duty to them in June 2016, appellants' breach of fiduciary duty claim was timely.

216. Whether a fiduciary relationship exists depends on the facts and circumstances of each case. *Nichols v. Schwendeman*, 10th Dist. No. 07AP-433, 2007-Ohio-6602, ¶ 15.

{¶ 43} Generally, "the relationship between an insurance agent and his [or her] client is not a fiduciary relationship, but rather, an ordinary business relationship." *Advent v. Allstate Ins. Co.*, 10th Dist. No. 05AP-1092, 2006-Ohio-2743, ¶ 14, citing *Slovak v. Adams*, 141 Ohio App.3d 838, 846 (6th Dist.2001). *See Nielsen Ents., Inc. v. Ins. Unlimited Agency, Inc.*, 10th Dist. No. 85AP-781 (May 8, 1986) (observing that, while the law "recognized a public interest in fostering certain professional relationships, such as the doctor-patient and attorney-client relationships, it has not recognized the insurance agent-client relationship to be of similar importance"). A fiduciary relationship may, however, "arise from such an informal relationship when both parties understand that a special trust or confidence has been reposed." *Advent* at ¶ 14, citing *Ed Schory & Sons, Inc. v. Francis*, 75 Ohio St.3d 433, 442 (1996). Accordingly, "a fiduciary relationship cannot be unilateral; it must be mutual." *Nichols* at ¶ 14, citing *Horak v. Nationwide Ins. Co.*, 9th Dist. No. CA 23327, 2007-Ohio-3744, ¶ 32. *See Craggett v. Adell Ins. Agency*, 92 Ohio App.3d 443, 451 (8th Dist.1993).

{¶ 44} "[A]n insured's reliance on his insurance agent is not sufficient, by itself, to establish a fiduciary relationship." *Nichols* at ¶ 18. In the absence of evidence demonstrating that the insurance agent understood the client reposed a special trust or confidence in the agent, the relationship remains an ordinary business relationship. *See Advent* at ¶ 15 (finding no fiduciary relationship because, although the client testified he relied on his insurance agent "to advise him of the appropriate insurance coverage to adequately protect himself," the client "never communicated his reliance to [his insurance agent]"); *Horak* at ¶ 58-59 (noting that, while the clients testified they relied on their agent's expertise, the evidence failed to demonstrate the insurance agent "understood [the clients]

were placing any special trust or confidence in him").[8]  A long-term relationship between an insurance agent and their client is also insufficient, on its own, to establish a fiduciary relationship.  *See Vinecourt Landscaping* at ¶ 37, 41 (finding that, although the client had known his insurance agent "since they were children" and had been a client of the insurance agent for over 20 years, the evidence failed to "demonstrate the bilateral understanding required to convert an arms-length business relationship into a fiduciary one"); *Advent* at ¶ 16 (noting the "13-year length of the parties' relationship [did] not, in these circumstances, establish a fiduciary relationship").

{¶ 45}  In *Hanick v. Ferrara*, 7th Dist. No. 19 MA 0074, 2020-Ohio-5019, the court found genuine issues of material fact regarding the existence of a fiduciary relationship between a client and her insurance agent.  *Id.* at ¶ 87.  The evidence in *Hanick* demonstrated the agent, who sold the client various annuities and life insurance policies over a period of six years, "knew [the client] relied on his advice," and that the client "cashed her annuity with ING when [the agent] advised her that he would be selling for another insurer" and gave the agent a personal loan of money.  *Id.* at ¶ 80.  The evidence further demonstrated the agent "had access to the funds in [the client's] annuity" and "directed withdrawals therefrom," and the client was "not informed about the essentials of the transactions [the agent] was having her complete."  *Id.* at ¶ 83-85.  The insurance agent admitted he "lecture[d] [the client] about spending money" and told the client "if she continued to run through her money in this manner he could no longer 'in good faith' be her agent," facts the court found "suggest[ed] he occupied a position akin to a financial adviser."  *Id.* at ¶ 84.  *See Mathias v. Rosser*, 10th Dist. No. 01AP-768, 2002-Ohio-2772, ¶ 18 (noting there is "general agreement that a broker or financial advisor is in a fiduciary relationship with his clients").  *See also Ashworth v. Lincoln Natl. Life Ins. Co.*, 10th Dist. No. 95APE09-1181 (Mar. 28,

---

[8] *See also FDT Group, L.L.C. v. Guaraci*, 10th Dist. No. 16AP-679, 2017-Ohio-663, ¶ 24 (concluding the evidence failed to demonstrate the insurance agent had "an understanding that [the] appellant was relying on his expertise when it came to [certain insurance] coverage," as the agent averred "he had an ordinary business relationship with [the] appellant"); *Vinecourt Landscaping* at ¶ 37, 40-41 (holding that, while the client testified he "did not understand his policies," trusted his insurance agent's judgment, and came to see his agent as "not only a procurer of insurance, but also as an overseer and prognosticator of [his] insurance needs"; as the client did not inform the agent of his reliance or "request explanations of the coverage," the evidence failed to demonstrate a fiduciary relationship); *Nichols* at ¶ 21 (finding no evidence of a fiduciary relationship as the insurance agent testified he had an "ordinary agent-client business relationship" with the clients and the clients had not "communicated their alleged special confidence or trust to [their insurance agent]").

1996) (finding genuine issues of material fact regarding whether a fiduciary relationship existed, as the evidence demonstrated the client relied on the agent "as his financial advisor").

**{¶ 46}** The record demonstrates that Palmer and Baransi knew each other for nearly 20 years, and that Palmer provided Baransi with personal auto, homeowners, and commercial policies of insurance for nearly 15 years. Baransi testified he trusted Palmer "100 percent," trusted Palmer would "take care of [him]," and that he "depended and counted on [Palmer]." (Baransi Depo. at 73; 103-04.) Baransi claimed he "didn't feel like [he] needed to read" his insurance policies because Palmer told him, "don't worry, I got you covered." (Baransi Depo. at 238-39.)

**{¶ 47}** Appellants contend Palmer was "aware that Baransi placed a special trust and confidence in him." (Appellants' Brief at 26-27, citing Palmer Depo. at 29-30, 35-36.) Portions of the transcript appellants cite to demonstrate that Palmer believed Baransi trusted him to give "good insurance advice" and that Baransi "went along" with and never rejected Palmer's advice regarding insurance. (Palmer's Depo. at 30, 35-36.) However, evidence that a client trusts their insurance agent and relies on their agent's advice pertaining to insurance demonstrates only an ordinary business relationship between an insurance agent and their client. *Nichols* at ¶ 18; *Vinecourt Landscaping* at ¶ 37-41; *Horak* at ¶ 56-59; *Advent* at ¶ 15.

**{¶ 48}** Appellants further contend Baransi "relied on all Palmer's directions and recommendations" and Palmer encouraged Baransi's "blind trust and reliance." (Appellants' Brief at 28, 31.) We disagree. The record demonstrates Baransi "rejected" Palmer's recommendation that Baransi "set his policies up for automatic payments," as Baransi wanted "to control his funds more closely than that, and didn't want to do that." (Palmer Depo. at 38.) Although appellants contend Palmer "offered financial advice,"[9] when Palmer was asked if he offered Baransi financial advice Palmer responded "[n]o," and

---

[9] Appellants rely on a statement from Palmer's LinkedIn profile page to support their contention that Palmer offered Baransi financial advice. (Appellants' Brief at 31.) Palmer's LinkedIn profile stated that Palmer could offer clients "knowledge regarding financial aspects of their business and personal lives," due to Palmer's "past employment in the financial services industry." (Palmer Depo., Ex. 3.) Palmer's LinkedIn profile fails to demonstrate that Palmer ever offered Baransi financial advice.

that he "[n]ever got into any finances" with Baransi. (Appellants' Brief at 31; Palmer Depo. at 40.) There is no indication that Palmer acted as a financial advisor to Baransi.

{¶ 49} Palmer explained he "recommended certain limits" based on "what [he knew] of [the Baransis] net worth and [their] real estate," and stated that he believed the Baransis were "insured to a standard for their financial situation as [he] knew it." (Palmer Depo. at 32, 62-63.)[10] Palmer did not independently recommend increasing the liability limit on the commercial policy to $1 million in 2014; rather, the record demonstrates the increase occurred in response to the requirements of Nazareth Deli's new landlord. When Palmer sent Baransi the removal form pertaining to the 2005 Explorer, Palmer specifically told Baransi to "[l]et me know if you need to discuss the Nazareth situation RE: Insurance. Not sure how I can help, but want to be here if you need to discuss your options." (Baransi Depo., Ex. N.) There is no indication that Baransi contacted Palmer to discuss his options regarding the commercial auto policy at that time.

{¶ 50} Appellants contend the evidence demonstrates the existence of a fiduciary relationship because Palmer would occasionally pick up Baransi's monthly premium checks, Dawson Insurance paid one of Baransi's monthly premium payments, and because Baransi appeared in a testimonial on the Dawson Insurance website. However, as the record demonstrates that Palmer picked up other clients' premium checks, Dawson Insurance occasionally paid other clients' premiums, and that Dawson Insurance displayed

---

[10] Dawson explained that an insurance agent would suggest coverage limits to a client based on the client's income, property, needs, occupation, and how much the client was willing to pay.

other clients' testimonials on their website, these facts demonstrate only an ordinary business relationship between a Dawson Insurance agent and their client.[11]

{¶ 51} Appellants further contend the trial court unnecessarily focused on the fact that Palmer, Baransi, and their wives had dinner together once to support its conclusion that a fiduciary relationship did not exist. The fact regarding the dinner, along with the other facts in the record pertaining to the social relationship between Palmer and Baransi, demonstrate only the existence of a friendship between the two men. Indeed, Palmer affirmed he considered Baransi to be a friend. Evidence of a friendship, however, does not elevate a relationship to a fiduciary relationship. *See Snyder v. Webb*, 10th Dist. No. 97APE09-1248 (June 18, 1998) (holding the trial court "erred in finding that a fiduciary relationship arose between [the] appellant and Mr. Snyder" due to their "social relationship"); *In re Estate of Hill*, 4th Dist. No. 99CA2663 (Mar. 15, 2000) (holding "a mere friendship in which a person renders gratuitous assistance to a friend does not give rise to a confidential or fiduciary relationship").

{¶ 52} When asked if it was his goal to build a "special confidence and trust" with Baransi, Palmer responded stating "[n]o -- no more than any other client." (Palmer Depo. at 36.) When asked if he had a special relationship with Baransi, Palmer stated the relationship was "[m]ore enhanced * * * because there was more frequent communication and contact and need to contact and communicate." (Palmer Depo. at 47.) Palmer explained that due to the "close neighborhood situation" between Nazareth Deli and the

---

[11] Palmer stated he would occasionally go to Nazareth Deli to pick up Baransi's premium checks, but also stated he went to the homes or businesses of "a dozen or more" clients to pick up their premium checks. (Palmer Depo. at 37.) Dawson Insurance paid one monthly premium payment for Baransi in December 2016, when Baransi was in the hospital following his auto accident, in order to prevent Baransi's policies from lapsing. Baransi refunded the payment once he was released from the hospital. In *Hanick*, the court noted that while a personal loan "*in general,* [would] appear to be a business transaction rather than evidence of a special relationship," the facts in *Hanick* "suggest[ed] something more" as the client "had to pay surrender charges on her annuity to provide [her agent] with the loan" and testified she did "not normally provide loans to people." (Emphasis sic.) *Id.* at ¶ 80, 86. Dawson explained he had paid clients' premium payments before, noting "[m]aybe it's a cancellation. Maybe the premium's late. You don't want to have to mess with a -- going through a reinstatement. There's a lot of reasons for that." (Dawson Depo. at 271.) Accordingly, the "something more" which was present in *Hanick* is not present in this case with respect to the one-time premium payment. Regarding the website testimonial, the record demonstrates that Baransi freely agreed to have his image and testimonial placed on the Dawson Insurance website. (Palmer Depo. at 47-49; Dawson Depo. at 188-89.) The testimonial next to Baransi's image on the website stated "[r]unning a busy restaurant? That's *my* thing," and corresponded with the Dawson Insurance motto: "*Insurance not your thing? That's Okay! It's ours.*" (Emphasis sic.) (Palmer Depo., Ex. 2.) Palmer explained the Dawson Insurance website had a "rotation of three or four different business clients on there." (Palmer Depo. at 46.)

Dawson Insurance office, if Baransi was "late on a payment * * * we'd run down to catch a payment on a Friday afternoon so that his policies didn't lapse." (Palmer Depo. at 36.) Thus, Palmer noted "[i]t was a special situation, [as] the geography made it simple for us to do." (Palmer Depo. at 37.)

{¶ 53} Even if we accept that Baransi reposed a special trust or confidence in Palmer, the evidence fails to demonstrate that Palmer understood Baransi had reposed a special trust or confidence in him, or that Palmer held a position of superiority and influence over Baransi. Palmer recommended coverage limits based on the information Baransi provided him, and Baransi rejected Palmer's advice when he did not agree with it. The record demonstrates Palmer viewed his relationship with Baransi as an ordinary business relationship, albeit one where he saw Baransi more frequently than other clients. However, the frequency with which Palmer and Baransi saw each other, and their social relationship, does not convert their relationship into a fiduciary relationship. Viewing the evidence in a light most favorable to appellants, we find no evidence to support the bilateral understanding necessary to convert the ordinary relationship between an insurance agent and their client into a fiduciary relationship.

{¶ 54} Accordingly, the trial court did not err by finding no genuine issue of material fact as to appellants' breach of fiduciary duty claim. Appellants' first assignment of error is overruled.

## VI. Third Assignment of Error – Negligent Misrepresentation

{¶ 55} Appellants' third assignment of error asserts the trial court erred when it found Palmer made no misrepresentations to appellants. The trial court noted appellants' contention that Palmer told Baransi "he was covered in 'every single possible way you can think of,' " and appellees' contention that Baransi had UIM coverage under his personal auto policy and business coverage under the commercial policy. (Decision at 11.) The court concluded "no genuine issue of material fact exist[ed] as to [appellants'] negligent misrepresentation claim." (Decision at 11.)

{¶ 56} The elements of a negligent misrepresentation claim are: " '1) one who, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest, 2) supplies false information for the guidance of others in their business transactions, 3) is subject to liability for pecuniary loss caused to

them by their justifiable reliance upon the information, 4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.' " *Patel* at ¶ 30, quoting *Federated Mgt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 395 (10th Dist.2000). *Accord Delman v. Cleveland Heights*, 41 Ohio St.3d 1, 4 (1989). " 'A representation made with an honest belief in its truth may still be negligent, because of the lack of reasonable care in ascertaining the facts, or in the manner of expression, or absence of the skill and competence required by a particular business or profession.' " *Merrill v. William E. Ward Ins.*, 87 Ohio App.3d 583, 590 (10th Dist.1993), quoting *Prosser & Keeton on the Law of Torts*, Section 107, 745 (5 Ed.1984). *See Marasco v. Hopewell*, 10th Dist. No. 03AP-1081, 2004-Ohio-6715, ¶ 53, citing 4 Restatement of the Law 2d, Torts, Section 552, Comment a (1977) (stating that "[l]iability for negligent misrepresentation is based upon the negligence of the actor in failing to exercise reasonable care or competence in supplying correct information").

{¶ 57} " 'A negligent misrepresentation does not lie for omissions; there must be some affirmative false statement.' " *Jones v. Carpenter*, 10th Dist. No. 17AP-401, 2019-Ohio-619, ¶ 55, quoting *Manno v. St. Felicitas Elementary School*, 161 Ohio App.3d 715, 2005-Ohio-3132, ¶ 34 (8th Dist.). *Accord Brothers v. Morrone-O'Keefe Dev. Co., L.L.C.*, 10th Dist. No. 06AP-713, 2007-Ohio-1942, ¶ 44. To be actionable, " 'a misrepresentation generally must relate to an existing or pre-existing fact.' " *Kondrat v. Morris*, 118 Ohio App.3d 198, 207 (8th Dist.1997), quoting *Platsis v. E. F. Hutton & Co., Inc.*, 642 F.Supp. 1277, 1293 (W.D. Mich.1986).

{¶ 58} Appellants contend Palmer made affirmative misrepresentations of fact when he told appellants they "were covered for $1 million under (all policies) the commercial policy and that he had Appellants covered in so many ways." (Appellants' Brief at 47-48.) Appellants further contend Palmer falsely told Baransi about the Dawson Insurance rule to "always match liability and UIM limits and all coverages were to be for at least $1 million." (Appellants' Brief at 51.) Appellants rely on the following portions of Baransi's affidavit to support their contentions:

> I was told by Mr. Palmer all the cars I drove were covered under the business insurance because he told me they had to be since I drove them all for work. He said he had thought of every angle to make sure I was covered in so many ways. He made

> statements like this throughout our relationship including after the business auto insurance was changed in June 2016.
>
> * * *
>
> Mr. Palmer told me that the business auto policy was to have matching limits for liability and underinsurance coverage covering all the vehicles I drove for work with $1 million in coverage.

(Baransi Aff. at ¶ 20, 25.)

{¶ 59} Accepting that Palmer told Baransi, after June 2016, that all cars Baransi drove for work were covered under the commercial auto policy for $1 million, such statement was not affirmatively false. The commercial auto policy specifically provided $1 million in liability coverage for non-owned autos after the removal of the 2005 Explorer. Palmer's statement that Baransi was "covered in so many ways" does not amount to an affirmative misrepresentation as to any fact. Indeed, the statement fails to convey that Baransi had any particular type of coverage at any certain amount. The statement is akin to non-actionable "puffery" in the sales context. *See Kondrat* at 207, quoting *Platsis* at 1293 (observing that statements " 'of opinion or belief such as occurs in "puffing" generally cannot constitute a misrepresentation' "); *Risner v. Regal Marine Industries, Inc.*, 8 F.Supp.3d 959, 1003 (S.D.Ohio 2014) (finding a seller's statement "touting the quality of its boats in general" constituted " 'puffing' and are not actionable under a negligent misrepresentation theory"); *Westfield Ins. Co. v. Huls Am., Inc.*, 128 Ohio App.3d 270, 295 (10th Dist.1998). Moreover, Palmer procured personal auto, homeowners, and commercial policies of insurance for Baransi, thereby providing Baransi with various types of insurance coverage.

{¶ 60} Although Baransi's affidavit states Palmer told him the commercial auto policy would have matching liability and UIM coverage limits of $1 million, Baransi does not provide any timeframe for this statement. From 2014 to June 2016, the commercial auto policy provided matching liability and UIM coverage limits of $1 million for the covered auto identified on the policy. Regardless, even if we construe Baransi's affidavit as indicating that Palmer told him, after June 2016, that any vehicle Baransi drove for work

had $1 million in UIM coverage, appellants could not establish their justifiable reliance on such a statement.

{¶ 61} For a negligent misrepresentation claim, a party's reliance is justifiable "if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representations." *Trepp, L.L.C. v. Lighthouse Commercial Mtge., Inc.*, 10th Dist. No. 09AP-597, 2010-Ohio-1820, ¶ 21, citing *Lepera v. Fuson*, 83 Ohio App.3d 17, 26 (1st Dist.1992). As such, a party's "failure to read the contract negates the justifiable reliance element," as a "person cannot reasonably rely upon the statements of the other contracting party when the person failed to read the contract." *Id.* at ¶ 22. *See Brown v. Woodmen Acc. & Life Co.*, 84 Ohio App.3d 52, 56 (12th Dist.1992) (finding the plaintiffs could not establish the justifiable reliance element of their negligent misrepresentation claim, as they only had to look at the "documentation evidencing the insurance coverage * * * to ascertain the amount of coverage provided for" under their policy); *Fordyce v. Hattan*, 2d Dist. No. 28342, 2019-Ohio-3199, ¶ 23.[12]

{¶ 62} After the June 2016 removal of the 2005 Explorer, the commercial auto policy unambiguously demonstrated there was no UIM coverage, let alone $1 million in UIM coverage, for any vehicle. Baransi admitted he did not read any of his policies of insurance. As such, appellants could not establish their justifiable reliance on any of Palmer's alleged statements regarding the terms of their policies to the contrary.

{¶ 63} Accordingly, even viewing the evidence in a light most favorable to appellants, the evidence fails to demonstrate a genuine issue of material fact as to their negligent misrepresentation claim. Appellants' third assignment of error is overruled.

---

[12] *See also Scassa v. Dye*, 7th Dist. No. 02CA0779, 2003-Ohio-3480, ¶ 45, quoting *J.A. Industries, Inc. v. All Am. Plastics, Inc.*, 133 Ohio App.3d 76, 84 (1999), quoting 37 Corpus Juris Secundum, Fraud, Section 44(A), at 229 (1997) (noting that " ' "a party dealing on equal terms with another is not justified in relying on representations where the means of knowledge are readily within his reach" ' ").

## VII. Fourth, Fifth, and Sixth Assignments of Error – Interlocutory Orders

{¶ 64} Appellants' fourth, fifth, and sixth assignments of error assert the trial court erred by denying appellants' motion for summary judgment,[13] granting appellees' motion to strike the doctors' affidavits,[14] and denying appellants' motion to compel the continuation of the Dawson deposition.[15]

{¶ 65} The denial of a motion for summary judgment is not, by itself, a final appealable order pursuant to R.C. 2505.02, as the denial does not determine the action or prevent a judgment. *Celebrezze v. Netzley*, 51 Ohio St.3d 89, 90 (1990). Thus, a trial court's denial of a motion for summary judgment is generally an interlocutory decision. *Vaccariello v. Smith & Nephew Richards, Inc.*, 94 Ohio St.3d 380, 386 (2002); *Stevens v. Ackman*, 91 Ohio St.3d 182, 186 (2001); *S.O.S. Constr. Industries, Inc. v. Columbus Metro. Hous. Auth.*, 10th Dist. No. 02AP-655, 2003-Ohio-15, ¶ 24; *Syphard v. Peterson/Accordia*, 7th Dist. No. 09 MA 151, 2010-Ohio-6501, ¶ 14. A trial court's ruling on a motion to strike

---

[13] The trial court denied appellants' motion for summary judgment finding that it could not "enter a judgment against [Ronnie Horn]," as Horn was "not a named defendant in this matter and therefore, was not served with the Complaint and Summons." (Decision at 11.) *See Ostendorf v. Darling*, 10th Dist. No. 20AP-454, 2021-Ohio-2781, ¶ 10, citing *Maryhew v. Yova*, 11 Ohio St.3d 154, 156-57 (1984) (holding that "[i]n order to render a valid judgment, a trial court must have personal jurisdiction over the defendant"); *Erin Capital Mgt., L.L.C. v. Fournier*, 10th Dist. No. 11AP-483, 2012-Ohio-939, ¶ 16, citing *State ex rel. Ballard v. O'Donnell*, 50 Ohio St.3d 182 (1990), paragraph one of the syllabus (stating that a trial court lacks personal jurisdiction "if effective service of process has not been made on the defendant and the defendant has not voluntarily appeared in the case or waived service"). However, the trial court failed to address the other arguments in appellants' motion for summary judgment regarding their damages.

[14] The trial court granted appellees' motion to strike the doctors' affidavits as it found the "cause and extent of Plaintiff Baransi's injuries related to the automobile accident [were] not issues before this Court." (Decision at 12.) However, Baransi's injuries and medical expenses resulting from the December 2016 accident are relevant to the damages element of appellants' negligence claim. *See Countrywide Home Loans, Inc. v. Huff*, 11th Dist. No. 2009-T-0044, 2010-Ohio-1164, ¶ 47, citing *Cleveland Builders Supply Co. v. Farmers Ins. Group of Cos.*, 102 Ohio App.3d 708, 714 (8th Dist.1995) (holding that a plaintiff bears the burden on "proving the nature and extent of damages whether an action sounds in tort or contract"); *Stuart v. Natl. Indem. Co.*, 7 Ohio App.3d 63, 66 (8th Dist.1982) (stating that "[a]n insurance agency that undertakes to acquire coverage for a customer and fails to do so by fault or neglect is liable to the customer for any resulting damage").

[15] As the Dawson deposition entered its fourth hour, appellants' attorney began to question Dawson regarding his knowledge of the injuries Baransi sustained in the December 2016 accident. Dawson testified he was not familiar with the injuries Baransi sustained in the accident. When appellants' counsel continued to ask questions regarding Baransi's injuries, appellees' counsel stated "[w]e're going to shut this down if you don't * * * move on." (Dawson Depo. at 305-06.) Appellants' counsel asked another question regarding Baransi's injuries, and appellees' counsel stated "[t]hat's it. You want to get the court on the phone, or what? 'Cause we're done." (Dawson Depo. at 307.) Appellants' counsel told appellees' counsel he "just shut down the deposition" and the deposition ended. (Dawson Depo. at 307.) Thereafter, appellees filed a Civ.R. 30(D) motion to terminate the deposition. Appellants filed a memorandum contra appellees' motion to terminate the deposition, and a motion to compel the continuance of the deposition and for sanctions. The trial court did not rule on these motions before issuing the final judgment in the case.

an affidavit is also an interlocutory ruling. *See Rallya v. A.J. Rose Mfg. Co.*, 9th Dist. No. 08CA009327, 2008-Ohio-6351, ¶ 12.

{¶ 66} Although the trial court never ruled on appellants' motion to compel the continuation of the Dawson deposition, we presume the court overruled the motion when it entered final judgment in the case. *Perpetual Fed. Sav. Bank v. TDS2 Property Mgt., L.L.C.*, 10th Dist. No. 09AP-285, 2009-Ohio-6774, ¶ 9 (stating "when a trial court enters judgment but fails to expressly rule on a pending pretrial discovery motion, it is ordinarily presumed that the court overruled the motion"); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 223 (1994). "Discovery orders are generally interlocutory[,] * * * especially those that deny discovery." *Curtis v. Adult Parole Auth.*, 10th Dist. No. 04AP-1214, 2005-Ohio-4781, ¶ 12, citing *DeAscentis v. Margello*, 10th Dist. No. 04AP-4, 2005-Ohio-1520, ¶ 27. *See Bowers v. Craven*, 9th Dist. No. 25717, 2012-Ohio-332, ¶ 15 (finding the "trial court's order denying Bowers' motion to compel discovery [was] merely an interlocutory order"); *United States Specialty Sports Assn., Inc. v. Majni*, 8th Dist. No. 110830, 2022-Ohio-3035, ¶ 37.

{¶ 67} "A trial court may reconsider and revise an interlocutory order at any time before the entry of final judgment," and may "vacate an interlocutory order during the pendency of an action." *Huntington Natl. Bank v. Haehn*, 10th Dist. No. 17AP-342, 2018-Ohio-4837, ¶ 24, citing Civ.R. 54(B). *See Pitts v. Ohio Dept. of Transp.*, 67 Ohio St.2d 378 (1981), fn. 1. As we have sustained appellants' second assignment of error, the trial court's order granting appellees' motion for summary judgment will be reversed in part and the case remanded for further proceedings on appellants' negligence claim. On remand, the trial court may reconsider, revise, or vacate the interlocutory orders which are the subject of appellants' fourth, fifth, and sixth assignments of error. As such, these assignments of error are rendered moot. *See Kelm v. Conkel*, 10th Dist. No. 16AP-494, 2017-Ohio-8545, ¶ 17 (stating the appellate court's "decision to reverse this cause and remand it for a new trial" rendered the trial court's decision denying the appellant's "motion for summary judgment an interlocutory, non-final appealable order"); *U.S. Bank N.A. v. Robinson*, 8th Dist. No. 105067, 2017-Ohio-5585, ¶ 13 (holding that, as the appellate court had "reinstated the foreclosure action, the denial of summary judgment is interlocutory at this stage of the proceedings"); *Redmond v. Big Sandy Furniture, Inc.*, 4th Dist. No. 09CA13, 2009-Ohio-

6824, ¶ 45 (stating that, as the appellate court had "remanded this case back to the trial court," the appellate court would not review the trial court's interlocutory order overruling a motion for sanctions, as the trial court "may decide to reconsider the issue of sanctions" on remand). Moreover, as the case is being remanded, the trial court should have the opportunity to formally rule on appellants' motion to compel the continuation of the Dawson deposition in the first instance. *See Ohio Atty. Gen. v. John Doe 26*, 141 Ohio App.3d 242, 253 (10th Dist.2000) (finding that, as the trial court "never specifically ruled" on a party's motion for discovery before entering final judgment, and because the "matter [was] being remanded," the "trial court [would] have the opportunity to formally rule on those issues in the first instance").

**{¶ 68}** Accordingly, our ruling on appellants' second assignment of error has rendered appellants' fourth, fifth, and sixth assignments of error moot. *See Kelm* at ¶ 18; App.R. 12(A)(1)(c).

## VIII. Conclusion

**{¶ 69}** Having sustained appellants' second assignment of error, rendering appellants' fourth, fifth, and sixth assignments of error moot, and having overruled appellants' first and third assignments of error, we reverse in part and affirm in part the judgment of the Franklin County Court of Common Pleas and remand to that court for proceedings consistent with law and this decision.

*Judgment affirmed in part*;
*reversed in part*; *and cause remanded.*

LUPER SCHUSTER, P.J., and McGRATH, J., concur.